## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

| | | |
|---|---|---|
| W. WELLS VAN PELT, JR., | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | **Case No.:** |
| v. | ) | **05CV477-K** |
| | ) | |
| UBS FINANCIAL SERVICES INC., | ) | |
| | ) | |
|     Defendant. | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF
## <u>UBS FINANCIAL SERVICES INC.'S MOTION TO VACATE</u>

Defendant UBS Financial Services Inc. ("UBSFS") submits this memorandum of law in support of its Motion to Vacate the arbitration award rendered on November 4, 2005 by an National Association of Securities Dealers ("NASD") Arbitration Panel in favor of plaintiff ("Award").

## <u>INTRODUCTION</u>

While judicial review of an arbitration award is circumscribed, a court must intervene and vacate an arbitration award where it is necessary to preserve the integrity of the arbitration process. Unless there is a mechanism to ensure that arbitration renders rational and judicial – like remedies, the incentive for parties to forgo their rights to be heard in court – expedience and economy – is lost as is the public policy goal of the Federal Arbitration Act ("FAA"). Absent judicial authority and desire to intervene and remedy legally incorrect and manifestly unjust arbitration results, participants will question whether a basic level of competency will be met.

Such an exercise of this Court's authority is necessary in this matter. As discussed herein, the Panel's Award clearly (1) ignores the plain language of the parties' agreements; (2) disregards well-settled law; and (3) violates well-defined and dominant public policy. As such, the Award is a miscarriage of justice and must be vacated as a matter of law.

## STATEMENT OF FACTS

Plaintiff W. Wells Van Pelt, Jr. was employed as a financial advisor by J.C. Bradford and its successor, UBS PaineWebber, Inc., from July 1999 to January 15, 2003. Exhibit A, p.4 and Exhibit B, p. 2. Defendant UBSFS is the successor to these entities.

On July 23, 1999, plaintiff executed and filed a Uniform Application for Securities Industry Registration or Transfer ("Form U-4") to transfer his securities industry registration to J.C. Bradford. Exhibit A. As part of plaintiff's Form U-4, plaintiff agreed "to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Item 10 as may be amended from time to time . . .." Exhibit A, p. 4. The NASD was one of the organizations listed in Item 10. Exhibit A, p. 1.

Plaintiff's employment with UBSFS was at-will. Plaintiff signed a written acknowledgment in UBSFS's Employee Handbook stating that he "under[stood] that the status of [his UBSSF] employment is that of an at-will employee . . . As such, [his] employment and compensation [could] be terminated with or without cause, and with or without notice, at any time, at the option of either [UBSFS] or [him]self." Exhibit C. Plaintiff further acknowledged that "no representative of [UBSFS], other than the President or his authorized designee, ha[d] the

2376423.15
LIB: CHARLOTTE

authority to enter into any agreement for employment for a specified period of time or to make any agreement contract to the foregoing." Id. No such contract was executed.

On May 24, 2000, plaintiff obtained an employee forgivable loan ("EFL") from UBSFS in the amount of $39,163.08. Exhibit D. The promissory note evidencing the EFL ("Promissory Note"), which was signed by plaintiff, provided that (1) the parties would arbitrate any dispute between plaintiff and UBSFS; (2) the EFL was not an employment contract and did not alter plaintiff's at-will employment status; (3) in the event that plaintiff's employment with UBSFS terminated, whether voluntarily or involuntarily, any outstanding balance on the EFL became due immediately; and (4) until the EFL was paid in full or one year had elapsed since the end of his employment with UBSFS, plaintiff would not "solicit, directly or indirectly any of the customers who maintain accounts at [UBSFS] ("Client of [UBSFS]") whom [plaintiff] serviced during his[] employment at [UBSFS] or other Clients of [UBSFS] whose names became known to [plaintiff] while in the employ of [UBSFS]." Exhibit D, pp. 2-3.

Following the completion of an internal UBSFS investigation, plaintiff's at-will employment was terminated on January 15, 2003 because of UBSFS's concerns regarding plaintiff conducting transactions at and near the close of the market in a customer's account. Exhibit B, p. 1. At the time of termination, the EFL had an outstanding balance of $17,676.54. Exhibit E. Plaintiff refused to repay the outstanding balance and the debt remained unsatisfied. Exhibits F and G.

On February 13, 2003, as required by Article V, § 3(a) of the NASD Bylaws, UBSFS filed a Uniform Termination Notice for Securities Industry Registration ("Form U-5").[1] Exhibit B. Section 3 of the Form U-5 requires the NASD member firm to provide an explanation of the termination of the financial advisor's registration within 30 days of the dismissal. Exhibit B, p.

_____

[1] Article V, § 3(a) of the NASD Bylaws is attached hereto as Exhibit H.

3

2376423.15
LIB: CHARLOTTE

1.  UBSFS filed the required Form U-5, stating in Section 3 that plaintiff's registration was terminated due to "Concerns about conduct regarding transactions at and near the close in a customer''s [sic] account."  Id.  Section 7B of the Form U-5 asks the following: "Currently is, or at termination was, the individual under internal review for fraud or wrongful taking of property, or violating *investment related* statutes, regulations, rules, or industry standards of conduct?" [emphasis in original]  Exhibit B, p. 2.  UBSFS indicated "No" in Section 7B because the internal investigation was completed prior to plaintiff's termination.  Id.  Section 7B only refers to current internal reviews or reviews taking place at the time of termination.  Following the filing of the Form U-5, both the NASD and Securities and Exchange Commission ("SEC") conducted an investigation of plaintiff's conduct.  Exhibits I and J.

On February 20, 2003, plaintiff executed and filed another Form U-4 transferring his securities industry registration to Moors & Cabot, Inc ("Moors & Cabot").  Exhibit K.  As with his previous Form U-4, plaintiff agreed "to arbitrate any dispute, claim or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organizations indicated in Section 4 (SRO Organization) as may be amended from time to time . . .."  Exhibit K, p.11.  Plaintiff also agreed to "release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any . . . information reported on the Uniform Termination Notice for Securities Industry Registration (Form U-5)."  Exhibit K, p. 12.

On January 28, 2004, plaintiff initiated an NASD arbitration proceeding against UBSFS. Plaintiff's Statement of Claim set forth the following claims: wrongful termination, defamation, intentional interference with prospective contractual relations, violation of the North Carolina Wage and Hour Act, violation of The Age Discrimination in Employment Act of 1967, tortious

4

2376423.15
LIB: CHARLOTTE

interference with contractual relationships, breach of the duty of good faith and fair dealing, conversion, civil conspiracy, and negligent infliction of emotional distress.  Exhibit L.

On April 20, 2004, UBSFS filed Respondents' Answer to the Statement of Claim, With Counterclaims and Motion to Dismiss.[2]  Exhibit M.  UBSFS denied plaintiff's allegations and moved to dismiss the Statement of Claim on the following grounds, among others: the parties' agreements provided that plaintiff's employment was at-will and could be terminated by either party with or without cause; North Carolina law does not recognize a claim for wrongful termination for an at-will employee; the statement in the Form U-5 was true and, nevertheless, privileged as a matter of law; and plaintiff specifically released any claim against UBSFS arising from the required Form U-5.  Id.  UBSFS asserted counterclaims for breach of a repayment obligation, breach of a non-solicitation agreement, tortious interference with contract, and violation of North Carolina's Unfair and Deceptive Practices Act.  Id. at pp. 29-30.  The Panel denied UBSFS's motion to dismiss on February 9, 2005, without a reasoned opinion.  Exhibit N.

The arbitration hearing was held in Charlotte, North Carolina, on October 3-7, 2005.  At the conclusion of plaintiff's presentation of evidence, UBSFS moved to dismiss plaintiff's claims.  Exhibit O, p. 3.  Plaintiff voluntarily dismissed the age discrimination allegations.  The Panel denied UBSFS's motion as to the remaining claims.  Id.

On November 4, 2005, the NASD provided the parties a copy of the Panel's Award.  Notwithstanding plaintiff's unequivocal release of any and all claims arising from the required Form U-5, the Panel specifically found that the explanatory sentence in the Form U-5 contained defamatory information and awarded plaintiff $2,471,330.00 in compensatory damages.  Exhibit O, p. 3.  The Panel also recommended the expungement of the explanatory sentence from the

_____

[2] A UBSFS employee was also named as a respondent in the arbitration proceeding.  The claims against the UBSFS employee were dismissed during the arbitration hearing.

2376423.15
LIB: CHARLOTTE

Form U-5.  Id.  In the very next sentence of the Award, however, the Panel recommended reinserting the very same sentence in the Form U-5 that it found to be defamatory, only deleting the extra apostrophe and adding the words "following an internal investigation."  Id.  While the Panel did not make a specific finding on the wrongful termination claim, it recommended the addition of the following language in the Form U-5:

> Although Mr. Van Pelt offered to resign rather than be terminated, his request was denied.  The Securities and Exchange Commission ("SEC") conducted an investigation regarding the transactions. The SEC did not initiate any enforcement action against Mr. Van Pelt following the conclusion of its investigation.  In addition, a Panel of arbitrators did not find evidence of misconduct by Mr. Van Pelt during the consideration of his claim against UBSFS for wrongful termination (NASD arbitration case #04-00619).

Exhibit O, p. 3-4.  The Panel also ordered UBSFS to file an amended Form U-5, changing its response to Section 7B to indicate that plaintiff was under internal review at the time of his termination and to provide "complete details regarding the internal review" that led to plaintiff's termination.  Exhibit O, p. 4.  Finally, the Panel awarded plaintiff $16,579 for expert witness expenses.  Exhibit O, p. 3.  All other requests for relief submitted by plaintiff were denied. Exhibit O, p. 4.

On November 15, 2005, plaintiff filed a Complaint with this Court seeking confirmation of the Award.  UBSFS's registered agent was served with a copy of the Complaint on or about November 18, 2005.  Plaintiff subsequently filed a Motion for Confirmation of Arbitration Award on December 6, 2005.  UBSFS filed its Answer and a Motion to Vacate on December 7, 2005.

6

2376423.15
LIB: CHARLOTTE

# LEGAL ARGUMENT

## I.  STATUTORY AND COMMON LAW GROUNDS TO VACATE AN ARBITRATION AWARD.

Section 10 of the FAA sets forth the following four grounds upon which an arbitration award may be vacated:

> (1) where the award was procured by corruption, fraud, or undue means;
>
> (2) where there was evident partiality or corruption in the arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. §10(a) (2005).  In addition to the specific grounds set forth in the FAA, it is well settled in this Circuit that a court may vacate an arbitration award if it (1) fails to draw its essence from the contract; (2) evidences manifest disregard of the law; or (3) violates well settled and prevailing public policy.  See Patten v. Signator Ins. Agency, Inc., 441 F.3d 230, 235 (4th Cir. Mar. 13, 2006); Upshur Coals Corp. v. United Mine Workers of America District 31, 933 F.2d 225, 229 (4th Cir. 1991); Remmey v. PaineWebber, Inc., 32 F.3d 143, 149 (4th Cir. 1994); Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Int'l Union, 76 F.3d 606, 608 (4th Cir. 1996).

2376423.15
LIB: CHARLOTTE

## II.     THE AWARD ON ITS FACE SHOULD BE VACATED.

While the judicial review of an arbitration award is circumscribed, "[t]he powers of an arbitrator are not unlimited." Monongahela Power Co. v. Local No. 2332, Int'l Bhd. of Elec. Workers, 566 F.2d 1196, 1198 (4th Cir. 1976). "The court . . . retains the obligation to insure that the arbitrator has acted within the contractually-drawn boundaries of his authority." Champion Int'l. Corp. v. United Paperworkers Int'l Union, 168 F.3d 725, 728 (4th Cir. 1999). An arbitrator "does not sit to dispense his own brand of industrial justice." Id. (internal citation omitted). When an arbitrator has "based an award on his own personal notions of right and wrong . . . a federal court has no choice but to refuse enforcement of the award." Patten, 441 F.3d at 235 (internal citation omitted). The Award in this matter is clearly beyond the Panel's contractual authority and no doubt was based on its own notions of right and wrong. Thus, the Award must be vacated.

### A.     The Court's Review Of The Award Should Be Limited To The Panel's Specific Finding.

"While arbitrators need not give their reasons for an award, . . . reviewing courts must rely on the arbitrator's reasoning to determine whether he was applying contractual terms or his own brand of industrial justice." Cannelton Indus., Inc. v. District 17, United Mine Workers. Of America, Local Union 8843, 951 F.2d 591, 594 (4th Cir. 1991) (internal quotation omitted). See also Hardy v. Walsh Manning Sec., L.L.C., 341 F.3d 126, 133 (2nd Cir. 2003) (court refused to consider alternative theories of liability when only one was provided by the arbitrators in the award, notwithstanding the fact that there may have been evidence sufficient to support alternative findings of liability); Harry Hoffman Printing, Inc. v. Graphic Commc'n Int'l Union, Local 261, 950 F.2d 95, 99 (2d Cir. 1991) (reviewing court "cannot simply ignore the arbitral opinion" and uphold arbitrator's decision on some ground not relied upon him). Further, the

8

2376423.15
LIB: CHARLOTTE

policy favoring enforcement of arbitration awards does not require a court to "disregard what an arbitrator says in order to justify what an arbitrator does." <u>Newark Morning Ledger Co. v. Newark Typographical Union Local 103</u>, 797 F.2d 162, 167 n.6 (3rd Cir. 1986). Rather, where the arbitrator's own words "manifest an infidelity" to the arbitrator's obligations, "courts have no choice but to refuse enforcement of the award." <u>United Steelworkers of America v. Enter. Wheel & Car Corp.</u>, 363 U.S. 593, 597 (1960).

The Award specifically states that the Panel found that the explanatory sentence in the Form U-5 was defamatory. Exhibit O, p. 3. The Panel, however, made no specific finding regarding plaintiff's wrongful termination claim, although it considered such a claim. Thus, the Award on its face provides only one finding of wrongdoing – that is for defamation. Any attempt to justify the Panel's finding of liability through any other alleged wrongdoing, such as wrongful termination, would be pure speculation and illogical. As mentioned earlier, the Panel found that UBSFS's stated reason for terminating plaintiff was in fact true as it restated the very same language UBSFS submitted on the Form U-5. Thus, by finding that the true reason for plaintiff's termination was "concerns about [plaintiff's] conduct," the Panel could not also have found that that very same reason was pretext for an unlawful termination. Accordingly, a finding of wrongful termination cannot be supported by the Award. Thus, the Court's review of the Award should be limited to the Panel's defamation finding.

**B.    The Panel Exceeded Its Powers By Ignoring The Repeated And Unequivocal Release Of UBSFS Of Any Liability Arising From The Form U-5.**

An arbitration award must be vacated if "the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4). Where a party seeks vacatur of an arbitration award on the ground that the arbitrator exceeded his power, it is the reviewing court's role to determine "whether the arbitrator did his job – not whether he did it well, correctly, or reasonably, but simply whether he did it."

9

2376423.15
LIB: CHARLOTTE

Mountaineer, 76 F.3d at 608 (internal citation omitted). An arbitrator fails to do his job if the award "fails to draw its essence from the [contract] or reflects the arbitrator's own notions of right and wrong." Id. "The requirement that the award 'draw its essence' from the parties' agreement means that '[t]he arbitrator may not ignore the plain language of the contract.'" U.S. Postal Service v. American Postal Workers Union, 204 F.3d 523, 527-28 (4th Cir. 2000). "An arbitration award fails to draw its essence from the agreement only when the result is not rationally inferable from the contract." Patten, 441 F.3d at 235. As noted by the Third Circuit, "[t]he bedrock of judicial enforceability of . . . [an] arbitral award, is the Supreme Court's admonition that the arbitrator's 'award is legitimate only so long as it draws its essence from the [parties'] agreement.' The arbitral award that fails that test is entitled to no deference." Newark Morning Ledger Co. v. Newark Typographical Union Local 103, 797 F.2d 162, 167 (3rd Cir. 1986) (citing United Steelworkers, 363 U.S. at 597). In other words, "[w]hen the arbitrator ignores the unambiguous language chosen by the parties, the arbitrator simply fails to do his job." U.S. Postal Service, 204 F.3d at 527. The Award in this matter is not rationally inferable from the parties' agreements and must be vacated.

On February 20, 2003, one week after UBSFS filed the Form U-5 stating the reason for plaintiff's termination, plaintiff executed and filed a Form U-4 to transfer his securities industry registration from UBSFS to his subsequent employer, Moors & Cabot. Exhibit K. Plaintiff agreed to "release each employer, former employer and each other person from any and all liability, of whatever nature, by reason of furnishing any . . . information reported on the Uniform Termination Notice for Securities Industry Registration (Form U-5)." Exhibit K, p. 12. This Form U-4 does not provide any exception to this agreed upon limitation of liability.

2376423.15
LIB: CHARLOTTE

Despite plaintiff's unambiguous release of UBSFS from any and all claims relating to the information reported on the Form U-5, the Panel specifically found that the explanatory sentence in the Form U-5 was defamatory and awarded plaintiff $2,471,330 in damages. Exhibit O, p. 3. The Panel gave no other basis for its finding of liability. Such a finding of liability ignores the plain and unambiguous language of plaintiff's Form U-4, exceeds the Panel's powers, and evidences a manifest disregard of the law.[3] See Hessel v. Goldman Sacks, et al., 281 A.D. 2d 247, 248 (N.Y. App. Div. 2001) (Form U-5 statements not actionable because plaintiff released former employer from liability for statements on prior U-5). The law in this Circuit is clear that such a fashioning of rough justice cannot be tolerated. See Patten v. Signator Insurance Agency, Inc., 441 F.3d 230, 234 (4th Cir. Mar. 13, 2006).

In Patten, a branch manager of a brokerage firm initiated an arbitration proceeding against his former employer for wrongful termination. The branch manager signed an arbitration agreement when he began working for the brokerage firm and signed a subsequent arbitration agreement when he was promoted to branch manager. Patten, 441 F.3d. at 231. The first arbitration agreement provided that an aggrieved party must provide written notice of any claim within one year of the event giving rise to the claim. The second agreement, which specifically superseded the first, did not contain any time limitation for providing notice of a claim. Id. at 231-232. The branch manager filed an arbitration claim approximately fourteen months after his employment was terminated without providing prior written notice. Id. at 232. Notwithstanding the arbitrator's conclusion that the second agreement did not contain a time limitation for

---

[3] While plaintiff did not argue that he was not bound by the Form U-4, numerous courts have held that a financial advisor is bound by the terms of the Form U-4 in disputes with former employers. See LSB Financial Services, Inc. v. Harrison et al., 548 S.E.2d 574, 578 (N.C. Ct. App. 2001) (while the Form U-4 is only an agreement between the NASD and the applicant, the parties to Form U-4 unequivocally intended that nonsignatories be bound by the terms of the such agreements under ordinary contract principles); In re Prudential Ins. Co. of America Litigation, 133 F.3d 225, 229 (3rd Cir. 1998) (Terms of Form U-4 enforceable between employee and firm not named in Form U-4).

11

2376423.15
LIB: CHARLOTTE

providing notice of a claim, the arbitrator concluded that the second agreement "necessarily contained an implied term limit." Id. at 234 (internal citation omitted). The arbitrator found that the arbitration proceeding was governed by both agreements and concluded that the arbitration claim was time-barred. The district court confirmed dismissal of the arbitration claim and the branch manager appealed. Id. at 233.

On appeal, the Fourth Circuit stated that an award should be vacated if the arbitrator "disregards or modifies unambiguous contract provisions." Id. at 235 (citing Mo. River Serv., Inc. v. Omaha Tribe of Neb., 267 F.3d 848, 855 (8th Cir. 2001)). The Court further stated that "an award fails to draw its essence from an agreement if an arbitrator has based his award on his own personal notions of right and wrong." [4] Id. (internal citations omitted). Where such circumstances exist, the Court concluded that it has "no choice but to refuse enforcement of the award." Id. (internal citations omitted). The Court found that the arbitrator ignored the plain and unambiguous language of the contract by inferring a one-year written notice provision and vacated the award. Id. at 236-237.

The Fourth Circuit reached a similar conclusion in Mountaineer Gas Co. v. Oil, Chemical & Atomic Workers Intern. Union, 76 F.3d 606 (4th Cir. 1996). In Mountaineer, a gas company employee was terminated per the company's drug policy after failing a random drug test. Mountaineer, 76 F.3d at 607. The employee subsequently initiated an arbitration proceeding against the employer pursuant to the applicable collective bargaining agreement. Following a hearing on the employee's termination, the arbitrator found an unwritten exception to the drug policy and ordered reinstatement of the employee. Id. Upon motion by the company, the district court vacated the award and the employee appealed.

---

[4] "While the 'essence of the agreement' standard was first articulated by courts reviewing labor arbitration awards, the courts have generally acknowledged that it applies to other arbitration proceedings as well." Patten, 441 F.3d at 235 n. 8.

2376423.15
LIB: CHARLOTTE

The Fourth Circuit affirmed the district court's vacatur of the award. The Court found that the arbitrator lacked the authority to amend, add to, or subtract from the agreement. Id. at 608. Thus, by creating a non-contractual exception to the company's authority to terminate its employees, the Court found that the arbitrator failed to do his job. Instead, the arbitrator "blatantly ignored" the contract's "unambiguous language" and fashioned a modified penalty that appealed to his own notions of right and wrong." Id. at 610. The Court found that such arbitrator conduct is not permissible as a matter of law and vacated the award.

In U.S. Postal Service v. American Postal Workers Union, 204 F.3d 523 (4th Cir. 2000), a probationary employee contested her termination from the United States Postal Service ("USPS"). The applicable collective bargaining agreement vested USPS with the authority to terminate probationary employees at any time during the probationary period and denied such employees access to grievance procedures, including arbitration. Notwithstanding these contractual provisions, the arbitrator held that the employee's grievance was arbitrable. Upon motion by USPS, the district court vacated the award on the ground that the arbitrator exceeded his authority. Id. The union appealed. Id. at 525

The Fourth Circuit affirmed vacatur of the award. The Court stated that a party cannot receive something in arbitration that was not part of the parties' agreement. Id. at 530. The Court found that the arbitrator ignored the clear language of the agreement and was not even "arguably construing or applying the contract." Id. at 531. Because the award did not draw its essence from the contract, vacatur was required. Id. See also Champion International Corporation v. United Paperworkers International Union, 168 F.3d 725 (4th Cir. 1999) (bonus award to employee required vacatur because there was no such provision in the parties' agreement); United States Postal Service v. American Postal Workers Union, 922 F.2d 256 (5th

13

2376423.15
LIB: CHARLOTTE

Cir. 1991) (the provision denying grievance procedures to terminated provisional employees is clear and unequivocal, such that an arbitration award to the contrary must be vacated); International Ass'n of Machinists & Aerospace Workers, Dist. 154, Local Lodge No. 2770 v. Lourdes Hosp. Inc., 958 F.2d 154, 157 (6th Cir. 1992) (court denied motion to confirm arbitration award because the arbitrator's findings were in "direct contradiction" of the terms of the agreement); Polk Bros. Inc. v. Chicago Truck Drivers, etc., 973 F.2d 593, 597 (7th Cir. 1992) (provisions "expressly bar" arbitrator's power to award reinstatement beyond termination dates of collective bargaining agreements); Cement Div., Nat. Gypsum Co. (Huron) v. United Steelworkers of America, etc., Local 135, 793 F.2d 759, 767 (6th Cir. 1986) (award vacated in part where arbitrator disregarded "express terms" in relying on his own notion of fairness in making his interpretation).

The awards in Patten, Mountaineer, and U.S. Postal Service were vacated because the arbitrators ignored the clear terms of the parties' agreements and granted relief not provided for in the agreements. In this matter, the Panel also ignored the clear terms of the parties' agreements and made a finding in direct contradiction of those terms. The Panel's finding of liability based on the allegedly defamatory statement in the Form U-5 blatantly ignores the express terms of the Form U-4.[5] By finding UBSFS's statement defamatory, the Panel failed to

---

[5] North Carolina courts consistently uphold and enforce valid release agreements. See VF Jeanswear Ltd. Partnership v. Molina, 320 F.Supp.2d 412, 419 (M.D. N.C. 2004) (citing McNair v. Goodwin, 136 S.E.2d 218, 223 (N.C. 1964) (affirming superior court entry of judgment against plaintiff who signed "Release of All Claims" because "the plain provisions of the release are sufficient to bar any manner of claim or action ... which [plaintiff] may assert"). Releases are contractual in nature and therefore governed by the rules of contract interpretation. See Financial Services of Raleigh, Inc. v. Barefoot, 594 S.E.2d 37, 42 - 43 (N.C. Ct. App. 2004). Consequently, "[w]hen the language of the contract is clear and unambiguous, . . . the court cannot look beyond the terms of the contract to determine the intentions of the parties." Id. (internal citation omitted). Rather the unambiguous terms are presumed to be the parties' intended agreement and the "contract must be construed to mean what on its face it purports to mean." Id. (internal citations omitted). When parties state they are releasing "all claims of any kind," the release means "precisely that: an intent to release all claims of any kind in existence." Id. Neither a court nor an arbitrator is free to edit the release and provide an exception not agreed to by the parties. See Cardiovascular Diagnostics Inc. v. Boehringer Mannheim Corp., 985 F.Supp. 615, 619 (E.D. N.C. 1997) (under North Carolina law a court cannot unilaterally include a limitation to a release where one does not otherwise exist).

14

2376423.15
LIB: CHARLOTTE

give effect to plaintiff's unequivocal release of liability in his Form U-4. The Form U-4 not only contained the parties' agreement to arbitrate, but importantly released UBSFS from any liability for its Form U-5 statements, thereby rendering such statements inactionable. Thus, a finding of defamation resulting from the statement made in the Form U-5 cannot draw it essence from the contract and the Award based on such findings must be vacated as a matter of law.

       **C.    The Panel's Award Fails To Draw Its Essence From The Contracts Because It Does Not Address Critical Contract Terminology.**

The Fourth Circuit has found that where an "arbitrator fails to discuss critical contract terminology, which terminology might reasonably require an opposite result, the award cannot be considered to draw its essence from the contract." <u>Clinchfield Coal Co. v. District 28, United Mine Workers of America & Local Union # 1452</u>, 720 F.2d 1365, 1369 (4th Cir. 1983). In <u>Clinchfield</u>, a mining company was prohibited by a collective bargaining agreement from leasing out "coal mining operations" if leasing the operations would result in the loss of union jobs. <u>Id.</u> at 1367. The mining company leased some of its coal lands to other mining companies. <u>Id.</u> Union employees were subsequently laid off and initiated an arbitration against the company. <u>Id.</u> The arbitrator held that the mining company did not satisfactorily prove that its leases did not cause the loss of the union jobs and ordered the company to rehire the employees. <u>Id.</u> The district court vacated the arbitrator's award, finding the award did not draw its essence from the contract because the arbitrator did not discuss or base his decision on the distinction between the term "coal mining operations" and coal mining lands. <u>Id.</u> at 1368-69. The union appealed.

The union argued that because the arbitrator listed the distinction between the term "coal mining operations" and coal mining lands as an issue raised by the company, the arbitrator necessarily considered the distinction and rejected it. In affirming the vacatur, the Court rejected the union's argument, stating that it was not enough for the arbitrator to simply state the issue of

15

2376423.15
LIB: CHARLOTTE

coal land versus "coal mining operations." Id. at 1369. The Court found that the award failed to draw its essence from the agreement because the arbitrator (1) failed to "discuss critical contract terminology, which . . . might reasonably require an opposite result;" and (2) "disregarded the 'common law of the . . . industry,' which 'is an integral part of the contract.'" 720 F.2d at 1369 (internal citation omitted). See also Island Creek Coal Company v. Local Union 1254, 1995 WL 543524, *2 (4th Cir. 1995) (unpublished opinion, attached hereto as Exhibit P) (affirming Clinchfield and expressly rejecting the arguments that (1) the Court's holding in Clinchfield is at odds with other authorities holding an arbitrator's interpretation of a contract is not subject to judicial review and (2) the holding in Clinchfield has been modified by the Court's subsequent recognition of limitations on judicial review).

Clinchfield requires vacatur of the Award in this matter. As in Clinchfield, the Panel listed the release argument in the Award as a defense raised by UBSFS, but neither discussed nor decided the issue of whether plaintiff's release impacted the Panel's sole basis of liability, defamation. Clearly, plaintiff's unequivocal release requires an opposite result to the finding of liability based on defamation in this matter. Under Clinchfield, the Panel is required to discuss such critical contract terminology. The Panel failed to do so. Accordingly, the Award cannot be considered to draw its essence from the Form U-4 and must be vacated.

**D.  The Award On Its Face Is Irrational And Manifestly Disregards The Requirement Of Falsity For A Defamation Claim Under North Carolina Law.**

An arbitration award may be set aside if "it is irrational or evidences manifest disregard for the law." Apex Plumbing Supply, Inc. v. U.S. Supply Company, Inc., 142 F.3d 188, 193 n.5 (4th Cir. 1998) (citing Upshur Coals Corp. v. United Mine Workers of Am., Dist. 31, 933 F.2d 225, 229 (4th Cir. 1991)). Indeed, the First Circuit has held that an award is irrational if it is

16

"based on reasoning so palpably faulty that no judge, or group of judges, ever could conceivably have made such a ruling." Advest v. McCarthy, 914 F.2d 6, 8-9 (1st Cir. 1990). An award evidences a manifest disregard of the law if the arbitrators (1) were aware of the law; (2) understood the law; (3) found it applicable to the case before them; and (4) chose to ignore it. See Remmey v. PaineWebber, Inc., 32 F.3d 143, 149 (4th Cir. 1994). "In certain circumstances[, however,] the governing law may have such widespread familiarity, pristine clarity, and irrefutable applicability that a court could assume that the arbitrators knew the rule and, notwithstanding, swept it under the rug." Advest, Inc. v. McCarthy, 914 F.2d 6, 10 (1st Cir. 1990). The Panel's defamation finding against UBSFS is irrational and evidences a manifest disregard of the law.

Plaintiff alleged that the sentence explaining the termination of his registration in the Form U-5 was defamatory under North Carolina law. Exhibit L, pp. 4-5. In order for a statement to be defamatory under North Carolina law, however, the statement must be false. See DaimlerChrysler Corp. v. H.C. Kirkhart, 561 S.E. 2d 276, 284 (N.C. Ct. App. 2002) (A claim of defamation under North Carolina law requires (1) publication of a false statement; (2) to a third party; and (3) damages); Long v. Vertical Tech., 439 S.E.2d 979, 802 (N.C. Ct. App. 1994) (Affirming trial court's dismissal of defamation claim where statements were not false); Martin Marietta Corp. v. Wake Stone Corp., 432 S.E.2d 428, 433 (N.C. Ct. App. 1993) (Truth is an absolute defense to a defamation claim). The Panel was aware of the falsity requirement for defamation. Exhibit M, p. 16. The Panel, however, ignored the falsity requirement. Instead, the Panel found that the language was defamatory while simultaneously recommending that the very same language remain part of plaintiff's Form U-5. These two findings are not reconcilable under North Carolina law.

2376423.15
LIB: CHARLOTTE

The Award states that the Form U-5 contained "defamatory information" and ordered the expungement of the sentence "Concerns about conduct regarding transactions at and near the close in a customer''s [sic] account." Exhibit O, p. 3. In the very next sentence, however, the Award recommends replacing the "defamatory" sentence with the following sentence: "Concerns about conduct regarding transactions at and near the close in a customer's account following an internal investigation." Id. The only differences in the two sentences are the correction of the extra apostrophe and the addition of the words "following an internal investigation." The addition of the words concerning the internal investigation does not alter the stated reason for plaintiff's termination. Indeed, relying on UBSFS's language in the original Form U-5 or the language recommended in the Award, the reason for plaintiff's termination is identical: "Concerns about conduct regarding transactions at and near the close in a customer's account." Instead of altering the meaning, the additional wording "following an internal investigation" simply buttresses UBSFS's basis for such concerns. Thus, by recommending the inclusion of the very same (if not stronger) "defamatory" language in plaintiff's Form U-5, the Panel necessarily found that the language was truthful. Such a finding ignores the well-settled North Carolina defamation law and evidences a manifest disregard of it.

The Second Circuit has held that a similar finding by an arbitrator amounted to a manifest disregard of the law. In <u>Hardy v. Walsh Manning Securities, L.L.C.</u>, 341 F.3d 126, 128 (2nd Cir. 2003), an investor filed an arbitration against a brokerage firm and one of its employees. Respondents argued that the employee could not be found liable through respondeat superior for the acts of a co-employee as a matter of law. <u>Hardy</u>, 341 F.3d 127-128. The investor argued that the company could be liable for the acts of the employees through the doctrine of respondeat superior, but was silent as to whether an employee could be liable for the acts of a co-employee

18

through respondeat superior. The Panel found the employee liable "based upon the principles of respondeat superior." Id. at 128. While there were other theories of liability asserted against the employee, the Panel did not make any findings with respect to the other claims. Hardy moved the district court to confirm the award, which was granted. Respondents appealed. Id. at 129.

The Second Circuit remanded the award due to the Panel's manifest disregard of the law. The Second Circuit reasoned that the "principle that respondeat superior is a form of secondary liability that cannot be imposed upon the fellow employee of a wrongdoer is certainly well-defined and explicit in New York." Id. at 130. The Court found that the Panel was made aware of the principle in the respondents' brief. Id. at 130. While Hardy argued that the Panel may have found liability based on the other claims, the Court stated that it is "crystal clear that the award states no other basis for liability than respondeat superior." Id. at 131. The Court reasoned that while there "may indeed be more than enough evidence in the record to find that [the employee] should have been found primarily liable[,] . . . that is not what 'the arbitrator's judgment' is in the instant case." Id. In refusing to confirm the award, the Court stated that "[i]n our case, we have crossed the line from confusion to inexplicability, and we can discern no reading of the Award that resolves its apparent contradiction with the law of respondeat superior.. . . [T]he award is not ambiguous and is not susceptible to more than one plausible reading. Nor does it rest on 'a colorable interpretation of the law.'" Id. at 132-133.

As in Hardy, the Panel was made aware of the falsity requirement for defamation claims under North Carolina law in UBSFS's pre-hearing briefs. In fact, plaintiff even recognized the falsity requirement and its applicability to the defamation claim. Exhibit Q, p. 15. ("Wells is entitled to show at a hearing that [the statement in the Form U-5] is **not true**." [emphasis in original]). The Award provides only one basis of liability, which is defamation. The Award also

19

specifically finds the explanatory sentence in the Form U-5 defamatory and then recommends its inclusion in the amended Form U-5. Thus, there is no reading of the Award that can resolve the obvious contradiction between the Panel's findings and the well-settled defamation law. Because the Award is irrational and does not rest on a colorable interpretation of the law, it should be vacated.

### E. The Panel's Finding Of Liability Based On An Allegedly Defamatory Statement In The Form U-5 Violates Dominant And Well Defined Public Policy.

The United States Supreme Court has recognized that arbitration awards are subject to challenge if they violate public policy. See United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 42 (1987). In Misco, the Supreme Court explained that the refusal to enforce an award that is contrary to public policy is a "specific application of the more general doctrine, rooted in the common law, that a court may refuse to enforce contracts that violate law or public policy." Id. "It is no less true in suits brought . . . to enforce arbitration awards than in other lawsuits that the '[sic] power of the federal courts to enforce the terms of private agreement is at all times exercised subject to the restrictions and limitations of the public policy of the United States.'" American Postal Workers Union v. U.S. Postal Service, 682 F.2d 1280 (9th Cir. 1982) (quoting Local 453, Int'l Union of Elec., Radio & Machine Workers v. Otis Elevator Co., 314 F.2d 25, 29 (2d Cir. 1986)). In fact, a court enjoys more latitude in reviewing an arbitrator's award for alleged violations of public policy. See Gulf Coast Industrial Workers Union v. Exxon Co., U.S.A., 991 F.2d 244, 249 (5th Cir. 1993). In reviewing an arbitration award for a violation of public policy, a court reviews the arbitrator's conclusions de novo. Id. ("[C]ourts are the ultimate arbiters of public policy in the arbitration context").

20

"To provide the basis for vacating an arbitration award, the public policy at issue must be 'explicit,' 'well defined,' and 'dominant.'" Eastern Associated Coal Corp. v. United mine Workers of America, Dist. 17, 531 U.S. 57, 63 (2000) (quoting W.R. Grace & Co. v. Local Union 759, 461 U.S. 757, 766 (1983)).  A "'well defined' and explicit public policy is one that can be 'ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interests.'" Id.  Ultimately, the reviewing court must vacate the award if public policy demands an outcome contrary to that reached in the arbitration award. See Eastern Associated Coal Co. v. United Mine Workers of America, 66 F.Supp.2d 796, 804 (S.D. W.Va. 1998) ("A court must . . .  determine whether or not there is a well defined and dominant public policy militating against the arbitrator's decision in [the] case.").  The Award in this matter clearly violates well-defined and dominant public policy and should be vacated as a matter of law.

        **1.      The Award violates public policy because it punishes UBSFS for truthfully complying with the industry disclosure requirements**.

Initially, public policy cannot support punishing UBSFS for fulfilling its regulatory obligations.  Article V, § 3(a) of the NASD Bylaws required UBSFS to file a Form U-5 within thirty days of plaintiff's termination.  Exhibit H.  Section 3 of the Form U-5 required UBSFS to provide an explanation for the termination of plaintiff's registration.  UBSFS complied with the NASD Bylaw and filed the Form U-5, stating in Section 3 that plaintiff's registration was terminated due to "Concerns about conduct regarding transactions at and near the close in a customer''s [sic] account."  Exhibit B, p. 1.  While the Panel found the language to be defamatory, the Panel did not find that UBSFS's explanation was false.  Instead, the Panel recommended that the identical explanation provided by UBSFS remain part of plaintiff's Form U-5.  Exhibit O, p. 3.  Thus, it is undisputed that UBSFS was required to provide an explanation

2376423.15
LIB: CHARLOTTE

for plaintiff's termination and gave a truthful one.  To impose liability on UBSFS for truthfully fulfilling its regulatory obligations violates public policy.

Further, notwithstanding the truth of UBSFS's statement in the Form U-5, public policy demands that certain types of communications are privileged.  See Smith v. McDonald, 895 F.2d 147, 149 (4th Cir. 1990) (citing North Carolina law, "[t]he great underlying principle of the doctrine of privileged communications rests in public policy").  It is well settled North Carolina law that "communications made in the course of an administrative proceeding are absolutely privileged if the administrative officer or agency is exercising a judicial or quasi-judicial function."  Id.  See also Allen v. Grandfather Home for Children, Inc., No. 1:99 CV 73-C, 2000 WL 1809004, *4 (W.D. N.C. 2000) (unreported opinion, attached hereto as Exhibit S) (statements made in quasi-judicial proceeding before the North Carolina Employment Security Commission absolutely privileged).  The public policy underlying absolute privilege is the proper and efficient administration of justice.  See Harman v. Belk, 600 S.E.2d 43, 47 (N.C. Ct. App. 2004) (internal citation omitted).  Participants in the judicial or quasi-judicial process must be able to participate in the process without fear of defamation suits.  See Houpe v. City of Statesville, 497 S.E.2d 82, 90 (N.C. Ct. App. 1998) (internal citation omitted).  See also Mazzucco v. N.C. Bd. of Medical Examiners, 228 S.E.2d 529, 532 (N.C. Ct. App. 1976) ("The public policy which supports the doctrine of absolute privilege fully supports the application of the doctrine to . . . the performance of . . . quasi-judicial statutory duties.)"

"Quasi-judicial proceeding" is "[a] term applied to the action, discretion, etc. of public administrative officer, who are required to investigate facts, or ascertain the existence of facts, and draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature."  Angel v. Ward, 258 S.E.2d 788, 792 (N.C. Ct. App. 1979).  Statements made

22

2376423.15
LIB: CHARLOTTE

to an administrative or regulatory agency are part of a quasi-judicial proceeding.  See Holmes v. Eddy, 341 F.2d 477, 481 (4th Cir. 1965) (private individual's voluntary communication with the SEC absolutely privileged under North Carolina law where the communication related to an SEC investigation); Howard v. Food Lion, Inc., 232 F.Supp.2d 585, 598 (M.D. N.C. 2002) (statements to a referee for a state employment security commission were absolutely privileged); Shall v. Piedmont Publishing Co., 266 S.E.2d 397, 400 (N.C. Ct. App. 1980) (physician's statements in a mental commitment proceeding are absolutely privileged as a witness in a quasi-judicial proceeding).  Thus, to the extent the statements at issue were made as part of a quasi-judicial proceeding, the statements are absolutely privileged.

The NASD is a self-regulatory organization registered with the SEC.  The NASD "provides a comprehensive system of oversight and self-regulation to ensure adherence by members of the industry to both the statutory mandates and ethical standards of the profession, and is authorized to inquire into whether one of its members or an employee thereof should be disciplined for violating a statute, rule, or regulation, a process that is adversarial in nature and affords the subject of the investigation due process protections (see 15 USC § 78f), including the right to appeal (15 USC § 78s[d])."  Cicconi v. McGinn, 27 A.D. 3d 59, 62 (N.Y. Ct. Div. 2005) (describing identical functions, powers, and processes of the New York Stock Exchange).  An NASD or SEC investigation following the termination of a financial advisor's registration is a quasi-judicial proceeding because it seeks to determine whether the financial advisor's conduct violated the law.  A Form U-5 filed by a member firm is the first step in any such investigation.  Thus, all information provided in a Form U-5 is absolutely privileged under North Carolina law.[6]

---

[6]  Other courts have held that statements made in a Form U-5 are absolutely privileged. Cicconi v. McGinn, Smith & Co., Inc., 27 A.D.3d 59, 61(N.Y. App. Div. 2005); Herzfeld & Stern, 175 A.D.2d 689 (N.Y. App. Div. 1991); Hessel v. Goldman, Sachs & Co., 281 A.D.2d 247, 248 (N.Y. App. Div. 2001); see also Matter of Dunn v. Ladenburg Thalmann & Co., 259 A.D.2d 544, 686 (N.Y. App. Div. 1999).

23

2376423.15
LIB: CHARLOTTE

Thus, any liability based on UBSFS's Form U-5 statement violates North Carolina public policy. Accordingly, the Award must be vacated.

To the extent to Court finds that the statement in the Form U-5 is only afforded a qualified privilege under North Carolina law, the statement is still privileged. A qualified privilege may only be overcome upon a showing of actual malice. See Dobson v. Harris, 530 S.E. 2d 829, 837 (N.C. 2000) (" If plaintiff cannot meet his burden of showing actual malice, . . . privilege . . . bars any recovery for the communication, even if the communication is false"). The Panel did not make a finding of actual malice in the Award. To the extent plaintiff argues that the Panel may have found actual malice but simply did not provide that finding in the Award, such argument cannot be reconciled with the fact that the Panel found that the statement in the Form U-5 was actually true. Indeed, as stated above, the Panel specifically found that UBSFS had "concerns about conduct regarding transactions at and near the close of the market in a customer's account," which are the identical concerns listed in the Form U-5. Exhibit B, p. 1. Truthfully reporting concerns as required by law cannot provide the necessary malice to overcome even a qualified privilege. Thus, public policy demands vacatur of the Award.[7]

> **2. The Award violates public policy because it requires UBSFS to provide "complete details regarding the internal review" that led to the statement that the Panel found to be defamatory, which would necessitate the publication of further "defamatory" information and could subject UBSFS to further liability.**

The Panel specifically found that UBSFS defamed plaintiff by providing a truthful one-sentence explanation of plaintiff's termination pursuant to NASD Bylaws. The Panel also

---

[7] Many states have found that statements in a Form U-5 are privileged based on public policy considerations. See e.g., Acciardo v. Millennium Sec. Corp., 83 F.Supp.2d 413 (S.D.N.Y. 2000); Dawson v. New York Life Ins. Co., 135 F.3d 1158 (7th Cir.1998); Glennon v. Dean Witter Reynolds, Inc., 83 F.3d 132 (6th Cir.1996); Andrews v. Prudential Sec., 160 F.3d 304 (6th Cir.1998); Prudential Sec. v. Dalton, 929 F.Supp. 1411 (N.D.Okla.1996); Eaton Vance Distrib. v. Ulrich, 692 So.2d 915 (Fla.Dist.Ct.App.1997).

2376423.15
LIB: CHARLOTTE

ordered UBSFS to file an amended Form U-5 and provide "complete details regarding the internal review" that led to plaintiff's termination and the statement that the Panel found to be defamatory. Exhibit O, p.4. Obviously, if UBSFS's one-sentence explanation of the reason for plaintiff's termination was defamatory and was the sole finding of wrongdoing supporting the $2,471,330 Award, then an amended Form U-5 setting forth "complete details regarding the internal review" that led to UBSFS's concerns about plaintiff's conduct will likely subject UBSFS to further liability. The Panel has already imposed liability for complying with NASD Bylaws. Public policy cannot support an Award that would subject UBSFS to additional liability. See New York Telephone Co. v. Comm. Workers of America Local 1100, 256 F.3d 89 (2nd Cir. 2001) (affirming vacated award where the relief ordered required violation of the law). Thus, the Award must be vacated.

## III. THE AWARD SHOULD BE VACATED TO THE EXTENT THE COURT FINDS THAT UBSFS'S LIABILITY MAY BE BASED ON A FINDING NOT INCLUDED IN THE AWARD.

As previously discussed, the Court's review of the Award should be limited to the Panel's sole finding of wrongdoing, defamation. To the extent, however, that the Court finds it appropriate to consider whether the Panel could have found liability based on an allegation other than defamation, vacatur is still required.

Plaintiff's claims against UBSFS arose out of plaintiff's termination, the statement in the Form U-5, or plaintiff's attempt to solicit UBSFS's customers after his termination. Exhibit K. As previously discussed, plaintiff released UBSFS from any and all liability based on the Form U-5. Any liability based on plaintiff's termination or plaintiff's attempted solicitation of UBSFS's customers also contradicts the explicit and unambiguous terms of the parties'

25

agreements. In addition to the Form U-4s, plaintiff executed a written acknowledgment of his employment at-will status in UBSFS's Employee Handbook. Exhibit C. Plaintiff also executed the Promissory Note, in which he acknowledged the at-will status of his employment. Exhibit D. The Promissory Note also contains a limited non-solicitation provision. Id. Thus, the critical provisions of these agreements precluded any finding of liability in this matter. The Panel also failed to discuss the critical contract terminology set forth in the parties' agreements. Finally, a finding of liability based on plaintiff's termination would evidence a manifest disregard of the law. Thus, to the extent the Court finds that the Panel's finding of liability could have been based on any of the non-defamation claims, the Award must be vacated.

**A.** **A Finding Of Wrongful Termination, Negligent Infliction Of Emotional Distress, Or Civil Conspiracy Would Contradict The Express Terms Of Plaintiff's Acknowledgment Of His At-Will Employment Status And The Terms Of The Promissory Note.**

Plaintiff's claims for wrongful termination, negligent infliction of emotional distress and civil conspiracy all arise out of the plaintiff's alleged improper termination. Exhibit L. The parties' agreements, however, specifically provide that plaintiff's employment was at-will and could be terminated without cause at any time by either party. Plaintiff expressly acknowledged his at-will employment status by signing UBSFS's Employee Handbook, affirming that he "under[stood] that the status of [his UBSFS] employment is that of an at-will employee . . . [and that his] employment and compensation [could] be terminated with or without cause, and with or without notice, at any time, at the option of either [UBSFS] or [him]self." Exhibit C. Further, the Promissory Note expressly states "[it] is not an employment contract or an agreement to employ [plaintiff] for a specified period of time or a promise to continued employment with [UBSFS] for any period whatsoever." Exhibit D, p. 5. There was no contract for employment for a definite term and, thus, any finding of liability based on plaintiff's termination could not

2376423.15
LIB: CHARLOTTE

draw its essence from the parties' agreements. As previously discussed, an arbitration finding that does not draw its essence from the parties' agreement must be vacated. See Patten v. Signator Insurance Agency, Inc., 441 F.3d 230, 243 (4th Cir. Mar. 13, 2006).

Further, North Carolina law does not alter plaintiff's at-will employment status. Unless there is an express employment contract for a definite period or term, employment in North Carolina is terminable by either party at any time, with or without cause, and for any lawful reason, no matter how unfair or untimely. See Dewitt v. Mecklenburg County, 73 F.Supp.2d 589, 599 (W.D. N.C. 1999) (under clearly established North Carolina law, absent a clear agreement to the contrary, employment is terminable at the will of either party). Thus, plaintiff's employment was terminable by either party at any time.

While the Panel did not make a specific finding of wrongful termination as it did with the allegedly defamatory language, the Panel stated that it "did not find evidence of misconduct by Mr. Van Pelt during the consideration of his claim against UBSFS for wrongful termination." Exhibit O, p. 4. Employee misconduct, however, is not a factor when considering a wrongful termination claim under the parties' agreement or North Carolina law. The Panel's statement, however, indicates that the Panel considered plaintiff's conduct to be a legitimate factor. Such consideration by the Panel directly contradicts the parties' agreements and requires vacatur of the Award, as under the agreements and law, UBSFS was free to terminate plaintiff's employment for no reason or even an improper reason so long as it was not an unlawful reason, i.e. discrimination.[8] See Mountaineer, 76 F.3d at 610 (vacating award where arbitrator created a non-contractual exception to the company's authority to terminate its employees).

---

[8] In Clinchfield, the court affirmed vacatur of the arbitration award not only for the award's failure to address critical contract terminology, but also because the arbitrator "disregarded the 'common law of the . . . industry,' which [was] 'an integral part of the contract.'" 720 F.2d at 1369, citing Norfolk Shipbuilding and Drydock Corp. v. Local No. 684, 671 F.2d 797, 800 (4th Cir.1982). North Carolina common law necessarily shapes all employment

2376423.15
LIB: CHARLOTTE

While there is a limited public policy exception to the general rule that an at-will employee cannot raise a claim for wrongful termination, plaintiff voluntarily dismissed his age discrimination allegations and presented no evidence of age discrimination at the hearing. Exhibit O, p. 3. Plaintiff made no other allegations that implicated a public policy exception. Thus, the terms of the parties' agreement governed the termination of plaintiff's employment. As such, the Panel could not have made a wrongful termination finding without ignoring the unambiguous terms of the parties' agreements.

### B. A Finding Of Negligent Infliction Of Emotional Distress Would Contradict The Express Terms Of The Form U-4s.

Plaintiff's claim of negligent infliction of emotional distress is based on the statement in the Form U-5. As previously discussed, however, plaintiff expressly released UBSFS for "any and all liability, of whatever nature, by reason of furnishing . . . that information reported on the Uniform Termination Notice for Securities Industry Registration (Form U-5)." Exhibit K, p. 12. A finding of liability based on the statement in the Form U-5 would contradict the express and unambiguous terms of the Form U-4s. Thus, any finding of negligent infliction of emotional distress must be vacated.

### C. A Finding Of Tortious Interference With Contractual Relationships, Intentional Interference With Prospective Contractual Relationships, Breach Of The Duty Of Good Faith And Fair Dealing, Or Conversion Would Contradict The Express Terms Of The Promissory Note.

Plaintiff's claims of tortious interference with contractual relationships, intentional interference with prospective contractual relationships, breach of duty of good faith and fair dealing, and conversion all arise out of plaintiff's attempted solicitation of UBSFS's customers following plaintiff's termination. Exhibit L. Specifically, plaintiff alleged that UBSFS

---

relationships in the State. Thus, a finding of wrongful termination in disregard of North Carolina law would also fail to draw its essence from the parties' agreements.

2376423.15
LIB: CHARLOTTE

interfered with UBSFS's customers by telling the customers that UBSFS "did not know where [plaintiff] was or how to reach him." Exhibit L, p. 8. Any finding of liability on these claims, however, would necessarily contradict the terms of the Promissory Note.

In May 2000, plaintiff obtained an EFL from UBSFS in the amount of $39,163.08, evidenced by the Promissory Note. Exhibit D. When UBSFS discharged plaintiff in January 2003, his EFL had an outstanding balance of $17,676.54. Exhibit E. Plaintiff was obligated under the Promissory Note to repay all amounts outstanding upon discharge. The Promissory Note also contained a limited non-solicitation provision, which provides in relevant part as follows:

> Until such time as Promissory Note #21172 has been forgiven by [UBSFS] in full pursuant to the terms herein, or repaid to [UBSFS] in full, or for a period of one year from [plaintiff's] termination date, whichever of these periods shall be less, [plaintiff] agrees, in the event [plaintiff] is terminated for any reason whatsoever, whether voluntary or involuntary: (i) to not solicit, directly or indirectly any of the customers who maintain accounts at [UBSFS] ("Clients of [UBSFS]") whom [plaintiff] serviced during his/her employment at [UBSFS] or other Clients of [UBSFS] whose names became known to [plaintiff] while in the employ of [UBSFS].

Exhibit D, pp. 2-3.

The Promissory Note specifically recognizes that the customers were UBSFS's customers, not plaintiff's. The Promissory Note further provides that plaintiff was not permitted to solicit, directly or indirectly, any of the customers until the EFL was repaid in full or one year had elapsed since plaintiff's termination. It is undisputed that plaintiff did not repay his EFL. Exhibits F and G. Thus, per the terms of the Promissory Note, plaintiff was not permitted to solicit UBSFS's customers until one year had elapsed since plaintiff's termination. To the extent the Panel found UBSFS liable based on plaintiff's attempts to solicit UBSFS's customers, the

29

finding would necessarily contradict the plain and unambiguous terms of the Promissory Note, and conversely, to the extent the Panel found plaintiff not liable to UBSFS for the amount of the EFL note on which he defaulted, the finding would likewise necessarily contradict the plain and unambiguous terms of the Promissory Note. Such a finding would not draw its essence from the parties' agreement and must be vacated.

### D. The Panel's Failure To Discuss The Critical Contract Terminology Set Forth Above Requires Vacatur Of The Award.

As previously discussed, the Fourth Circuit's holding in Clinchfield requires vacatur of an award where an arbitrator fails to discuss critical contract terminology that might reasonably require an opposite result. See Clinchfield, 720 F.2d at 1369. The Form U-4s, Promissory Note, and plaintiff's acknowledgment in the Employee Handbook all contain critical contract terminology that preclude any finding of liability in this matter. The Panel, however, failed to discuss any of these critical terms in the Award. Accordingly, the Award cannot be considered to draw its essence from the contract and must be vacated. (See Section II-C supra.)

### E. A Finding Of Liability Based On Wrongful Termination Manifestly Disregards North Carolina Employment At-Will Law.

As previously discussed, the parties' agreements provided that plaintiff's employment was at-will and North Carolina is an employment at-will state. The Panel was exhaustively educated on these points and the Panel's Award sets forth UBSFS's employment at-will defense. Exhibit O. See Exhibit M, p. 14 (citing Dewitt v. Mecklenburg County, 75 F.Supp.2d 589, 599 (W.D.N.C. 1999) (the clearly established law in North Carolina is that unless an employment contract expressly states a specific term, employment is terminable at the will of either party. As a result, employees may not generally bring a common law cause of action for wrongful termination except in narrowly defined circumstances where an employee was terminated in

30

2376423.15
LIB: CHARLOTTE

violation of public policy.)); Exhibit L, p. 3 ("North Carolina is an employment 'at-will' state, which normally would not support a cause of action for wrongful termination"). Plaintiff failed to cite any North Carolina law to the contrary. Instead, plaintiff argued that other jurisdictions recognize an exception to the well settled North Carolina law that wrongful termination claims will not lie with an employee at-will. It was undisputed, however, that North Carolina law governed plaintiff's claims. Thus, the Panel knew the status of the law, knew it was applicable to plaintiff's claims, yet chose to ignore it to the extent it found UBSFS liable for wrongful termination.[9]

Further, while the Panel did not make a specific finding of wrongful termination, it stated that it "did not find evidence of misconduct by Mr. Van Pelt during the consideration of his claim against [UBSFS] for wrongful termination." Exhibit O, p. 4. This statement indicates that the Panel considered plaintiff's conduct to be an element of his wrongful termination claim. Such a consideration would directly contradict the parties' agreements and ignore the well-settled North Carolina employment at-will law.

Finally, while the parties' agreements and North Carolina law do not require a legitimate reason for terminating an at-will employee, the Panel specifically found that UBSFS had concerns about plaintiff's conduct. Specifically, the Panel found that plaintiff was terminated due to "concerns about conduct regarding transactions at and near the close of the market in a customer's account." Exhibit O. Terminating an employee upon concerns of market manipulation certainly does not amount to wrongful termination under any circumstance. Any

---

[9] As previously discussed, while there is a limited public policy exception to North Carolina employment at-will law, there were no allegations that would trigger a public policy exception at the time the panel rendered the Award. Plaintiff originally argued in the alternative that his termination was motivated by age discrimination in violation of North Carolina law. Exhibit K, p. 4. Plaintiff, however, voluntary dismissed his age discrimination allegations and presented no evidence of age discrimination at the hearing, rendering the public policy exception moot.

2376423.15
LIB: CHARLOTTE

finding to the contrary would be irrational and in manifest disregard of the law. Thus, the Award must be vacated.

**F.    A Sole Finding Of Liability Based On The North Carolina Wages And Hours Act Could Not Support The Award.**

The size of the Award precludes a finding of liability based solely on a violation of the North Carolina Wages and Hours Act, under which plaintiff sought reimbursement for his prior year's bonus and unpaid commissions. These alleged amounts did not approach the amount of the Award. Specifically, plaintiff's Amended Damage Calculation and the Award set forth $16,000 in alleged damages for unpaid commissions and $6,796 for an unpaid bonus. Exhibits R and O. The compensatory Award was $2,471,330.00. Thus, the Panel must have found liability on at least one other claim. Because all other claims violate the express terms of the parties' agreements, directly conflict with well settled law, or violate public policy, the Award must be vacated.

## CONCLUSION

The parties entered into express and unambiguous written contracts to govern their relationship. The Panel disregarded these agreements in fashioning its own form of rough justice. The Panel also disregarded well settled law and public policy considerations. Such an abuse of the Panel's authority cannot be tolerated as a matter of law. Accordingly, the Award must be vacated.[10]

---

[10] Transcripts of the tapes of the arbitration hearing and the NASD Record are attached hereto as Exhibits T and U respectively.

32

2376423.15
LIB: CHARLOTTE

**WHEREFORE,** UBSFS respectfully requests that the Court vacate the Award and remand this matter for de novo review by a new arbitration panel. In the alternative, UBSFS respectfully requests that the Court vacate the Award and remand the matter to the arbitration Panel for clarification of its findings and discussion of the critical contract terminology in the parties' agreements.

s/ William O. L. Hutchinson
NC State Bar No. 32742
George C. Covington
NC State Bar No. 8215
Erika A. Olson
NC State Bar No. 34135
Attorneys for *Defendant*
KENNEDY COVINGTON LOBDELL &
HICKMAN, LLP
Hearst Tower, 47th Floor
214 N. Tryon Street
Charlotte, North Carolina 28202
Telephone: (704) 331-7400
Facsimile: (704) 353-3132
E-mail: whutchinson@kennedycovington.com

2376423.15
LIB: CHARLOTTE

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 27, 2006, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following:

andywhiteman@hwlawyers.com

and I certify that I have mailed the document to the following non CM/ECF participants:

Sarah G. Anderson
Clawson & Staubes, LLC
126 Seven Farms Dr, Ste 200
Charleston, SC 29492-7595

Charles P. Murdter
1050 Connecticut Ave Ste 1000
Washington, DC 20036

s/ William O. L. Hutchinson
KENNEDY COVINGTON LOBDELL &
HICKMAN, LLP
Hearst Tower, 47th Floor
214 N. Tryon Street
Charlotte, North Carolina 28202
Telephone: (704) 331-7400
Facsimile: (704) 353-3132
E-mail: whutchinson@kennedycovington.com

2376423.15
LIB: CHARLOTTE