IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
Civil Action No. 3:05-CV-477-K

| | |
|---|---|
| W. WELLS VAN PELT, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| UBS FINANCIAL SERVICES, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO VACATE ARBITRATION AWARD

Plaintiff Wells Van Pelt submits this Memorandum in further support of his motion to confirm the arbitration award and in opposition to Defendant's Motion to Vacate the award.

UBS has failed to offer any compelling reason why this Court should take the extraordinary action of second-guessing the Arbitration Panel and vacating its decision in favor of Mr. Van Pelt. To the contrary, UBS's arguments are little more than a repetition of those offered to the Panel – arguments that were rejected by the Panel after extensive briefing and a full hearing. UBS's Motion to Vacate the arbitration award should therefore be denied and the arbitration award should be confirmed in its entirety.

### FACTS

This case arises from the termination of Plaintiff's employment as a financial advisor at UBS in January 2003. At the time that he was fired by UBS, Wells Van Pelt, Jr., had been in the securities industry for 30 years, both as a registered representative and a branch office manager

(Tr. tape 1, 41:3-4)[1] and had a clean record until UBS summarily terminated his employment and filed a Form U5 stating that his termination was for: "Concerns about conduct regarding transactions at and near the close in a customer's account." R02399.[2]

The effect of UBS's wrongful conduct was to destroy the career of a man who had never had a customer complaint and received many letters of praise from his superiors and clients at UBS. Tr. tape 2, 11:2-17:23. Although Mr. Van Pelt and his attorneys asked UBS to allow Mr. Van Pelt to resign, UBS refused even in the face of strong legal authority that their position was unreasonable and untenable. A letter from Mr. Van Pelt's attorney Peter Crane Anderson to John O'Connell in the UBS Legal Department sets forth the issues very cogently, but UBS consistently refused to reconsider its decision. A copy of this letter is attached to the Statement of Claim as Exhibit B (R1391-1395) and is attached as Exhibit 1 to this Memorandum.

By terminating Mr. Van Pelt's employment with a black mark on his record, UBS deliberately intended to prevent him from finding employment with another firm and to retain his 600 to 800 customer accounts and $70 million dollars in assets under management. Tr. tape 5, 21:22-22:2. UBS then had its own brokers call Mr. Van Pelt's customers and solicit their accounts. Tr. tape 5, 17:14-24. UBS's bad faith is shown in that even after Mr. Van Pelt and his attorneys notified UBS in writing of his new employment, it continued to tell his customers that it did not know where he was or how to reach him. Tr. tape 4, 17:6-18:24; tape 5, 11:9-12:5, 13:4-17; 14:2-12.

At the time of his termination in 2003, Mr. Van Pelt was 56 years old, the sole support for his wife and 2 young children (then, ages 3 and 5). Tr. tape 1, 38:3-5. Many of Mr. Van

---

[1]  Tr. tape #, page:line are references to a transcript of the arbitration hearing created from a series of audiotapes and filed with the Court as Exhibit T to the Defendant's Memorandum.

[2]  R ____ are references to the page numbers of the official NASD record in this case, filed as Exhibit U to the Defendant's Memorandum in support of its Motion to Vacate.

Pelt's customers had been with him since his days at Smith Barney where he had several hundred customers and more than $100 million in assets under management. Tr. tape 1, 43:19-44:7. However, Mr. Van Pelt was told by firm after firm that they could not even interview him in view of the Form U5 filed by UBS. Tr. tape 5, 22:7-25:2, 12-23. As a result of UBS's conduct, Mr. Van Pelt's gross production dropped from more than $400,000 a year to a mere $150,000 and his income from $160,000 to only $40,000 a year. R02270-02284. At age 56 when the Statement of Claim was filed, he did not have time left to build up a new book of business.

Although Mr. Van Pelt, he had always been very compliance-oriented, UBS chose a compliance issue as a basis for firing. Tr. tape 1, 49:1-9; tape 4, 13:14-18. While he was branch office manager of PaineWebber's Winston-Salem branch office, no brokers under his supervision received any customer complaints based on conduct that occurred on his watch as branch office manager. Tr. tape 1, 47:17-21. Moreover, Mr. Van Pelt has never had a customer complaint in 30 years as a broker and branch office manager. R02399-02402. When they fired Mr. Van Pelt, UBS never told him what rule, if any, he violated. Tr. tape 4, 17:6-8.

Anyone in the securities industry would read the meaning of the ground that was stated by UBS on Mr. Van Pelt's Form U5 for its involuntary termination of his employment as "market manipulation in a client's account." UBS's statement was either knowingly false or reckless, as proved at the hearing of this case. In fact, counsel for UBS stipulated on the record that UBS was unable to prove market manipulation:

> [T]he Respondents in this matter, UBS Financial Services, Inc. and Michael Williams, hereby stipulate that neither Respondent found or concluded that Wells Van Pelt in fact manipulated the closing price or inside bid price of Information Architects stock in May or June of 2002, and that the Respondents stipulate that Mr. Van Pelt was not terminated in whole or in part on a conclusion that the Information Architects stock was in fact manipulated.

Tr. tape 12, 34:12-19.

However, when counsel for Mr. Van Pelt asked UBS's counsel whether "in light of his stipulation ... he is now willing to stipulate to expunge Mr. Van Pelt's U5," UBS's counsel responded: "Absolutely not." Tr. tape 12, 36:23-37:3.

In addition to UBS's stipulation, both the NASD and the Securities and Exchange Commission ("SEC") commenced investigations of the circumstances surrounding Mr. Van Pelt's termination, based on UBS's Form U5 reporting. However, neither agency ever brought a proceeding against Mr. Van Pelt and neither disciplined him or UBS as a result of the alleged market manipulation. Tr. tape 5, 4:7-5:3, 5:23-6:1, 8:8-10. No customer complaint was ever made on this basis either. R02399-02402. Despite the clear evidence that UBS's conclusion concerning market manipulation was either false or without sufficient basis, UBS to this day, three years after his termination, has never updated Mr. Van Pelt's Form U5. R02399-02402; Tr. tape 12, 36:23-37:3.

On January 28, 2004, Mr. Van Pelt demanded arbitration against UBS and its regional manager, Michael Williams, by filing a Statement of Claim and Uniform Submission Agreement with the NASD. R00002. Plaintiff's Statement of Claim alleged wrongful termination, defamation, intentional interference with prospective contractual relations, violation of the North Carolina Wage and Hour Act, violation of The Age Discrimination in Employment Act of 1967, tortious interference with contractual relationships, breach of the duty of good faith and fair dealing, conversion, civil conspiracy, and negligent infliction of emotional distress.

UBS and Williams submitted a Statement of Answer, Counterclaim, and Motion to Dismiss. In its counterclaim, UBS alleged breach of a repayment obligation, breach of a non-solicitation agreement, tortious interference with contract, and violation of North Carolina's Unfair and Deceptive Practices Act.

An arbitration hearing was held in Charlotte, North Carolina, for five days on October 3 through 7, 2005. R01360-61. At the hearing, on October 6, 2006, Plaintiff agreed to dismiss the age discrimination claim as well as all claims against Michael Williams. Tr. tape 19, 63:17-19, 64:9-13. The Panel denied UBS's motion to dismiss Plaintiff's wrongful termination claim.

On November 4, 2005, the NASD served the arbitrators' unanimous decision. The entirety of the Arbitration Panel's decision under the section entitled "Award" states:

> After considering the pleadings, the testimony and evidence presented at the hearing, and the post-hearing submissions, the Panel has decided in full and final resolution of the issues submitted for determination as follows:
>
> 1. Respondent UBS is liable and shall pay to Claimant compensatory damages in the amount of $2,471,330.00;
>
> 2. Respondent UBS is liable and shall pay to Claimant the sum of $16,579 for the expenses Claimant incurred for his expert witnesses;
>
> 3. The Panel finds that the Form U-5 filed with CRD by Respondent UBS PaineWebber Inc. (CRD 8174) on behalf of Claimant W. Wells Van Pelt contains defamatory information. The Panel therefore recommends the expungement of the Termination Comment as reported in Item 3 of the Form U5 filed with CRD by Respondent UBS, which states "Concerns about conduct regarding transactions at and near the close in a customer"'s (sic) account." The replacement language for the termination comment is "Concerns about conduct regarding transactions at and near the close in a customer's account following an internal investigation. Although Mr. Van Pelt offered to resign rather than be terminated, his request was denied. The Securities and Exchange Commission ("SEC") conducted an investigation regarding the transactions. The SEC did not initiate any enforcement action against Mr. Van Pelt following the conclusion of its investigation. In addition, a Panel of arbitrators did not find evidence of misconduct by Mr. Van Pelt during the consideration of his claim against UBS for wrongful termination (NASD arbitration case #04-00619)." There is no change recommended to the original reason for termination (i.e., discharge). The expungement recommendation is based on the defamatory nature of the information contained in Claimant's CRD record;
>
> 4. The Panel orders that Respondent UBS file an amended Form U5 with CRD on behalf of Claimant. Question 7B (Internal Review) should be answered "Yes" and complete details regarding the internal review should

be provided on a U5 Internal Review Disclosure Reporting Page (DRP). The amended Form U5 should be filed with CRD within 30 days after this award is served to all parties;

5.    All other requests for relief submitted by Claimant are hereby denied;

6.    Respondent UBS's Counterclaim is denied in its entirety;

7.    All claims against Respondent Williams are dismissed in their entirety;

8.    The parties shall bear their respective costs, including attorney's fees, except as Fees are specifically addressee below; and

9.    Any and all relief not specifically addressed herein, including punitive damages, is denied in its entirety.

On November 15, 2005, Mr. Van Pelt filed his Complaint in this Court seeking to confirm the arbitration award. Thereafter, UBS filed its motion to vacate the award. Additional facts necessary to an understanding of the case will be discussed below.

## ARGUMENT

### I.    INTRODUCTION.

UBS, while initially acknowledging the circumscribed nature of this Court's review, proceeds to re-litigate virtually all of the issues decided by the Arbitration Panel. For example, the issue concerning the scope of the so-called "release" contained in the Form U4 was fully presented, briefed and argued before the Panel. Clearly, the Panel rejected UBS's argument concerning the alleged release of Plaintiff's claims. This aspect of the Panel's decision finds support in cases decided by New York courts and other courts. Notwithstanding the Panel's plain rejection of its argument, Defendant indulges in a longwinded reprise of the position it advanced in its pre-hearing Motion to Dismiss and at the arbitration hearing; *i.e.* that the language of the Form U4 serves to insulate its tortious conduct.

Similarly, UBS raises before this Court two issues concerning the statements that it made in the Form U5 – *i.e.* whether the statements were true or subject to an absolute privilege. However, Defendant previously presented these same arguments – both of which were vigorously contested – before the Arbitration Panel, which decided both in Plaintiff's favor.

In sum, Defendant's Motion to Vacate offers little more than a reiteration of the arguments that it previously litigated – and lost – before the Arbitration Panel. Although UBS is doubtless disappointed that its arguments were rejected, that is no basis for upsetting the Award. In this respect, UBS's position is the same as the dissatisfied plaintiff in *Hilb Rogal & Hobbs Co. v Golub*, 2006 WL 2403390 (E.D. Va. 2006), where the district court noted: "Essentially, [plaintiff] argues that the arbitration panel's disregard is manifest in the very fact that it ruled against [it]. ... The doctrine of *res ipsa loquitor* does not apply in this context. Manifest disregard of the law is not evident on the face of an adverse legal decision." *Golub*, 2006 WL 2403390 at *5.

## II.   STANDARD OF REVIEW

The scope of review exercised by courts over arbitral decisions is severely limited. This limitation of judicial review is necessary to encourage the use of arbitration as an alternative to formal litigation – a policy that is widely recognized. *See, e.g, Shearson/American Express Inc. v. McMahon,* 482 U.S. 220, 226 (1987); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp,* 460 U.S. 1, 24 (1983). A policy favoring arbitration would mean little if arbitration were viewed merely as the prologue to prolonged litigation. If such were the case, one would hardly achieve the "twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." *Folkways Music Publishers, Inc. v. Weiss,* 989 F.2d 108,

111 (2d Cir.1993); *see also Eljer Mfg., Inc. v. Kowin Dev. Corp.,* 14 F.3d 1250, 1254 (7th Cir.), *cert. denied,* 512 U.S. 1205 (1994).

Thus, in reviewing arbitral awards, a district court is limited to determining "whether the arbitrators did the job they were told to do – not whether they did it well, or correctly, or reasonably, but simply whether they did it." *Richmond, Fredericksburg & Potomac R.R. Co. v. Transportation Communications Int'l Union,* 973 F.2d 276, 281 (4th Cir. 1992)(quoting *Brotherhood of Locomotive Engineers v. Atchison, Topeka & Santa Fe Ry. Co.,* 768 F.2d 914, 921 (7th Cir.1985)).

Courts are not free to overturn an arbitral result because they would have reached a different conclusion if presented with the same facts. In the Federal Arbitration Act, 9 U.S.C. §§ 1-16, Congress has limited the grounds upon which an arbitral award can be vacated. Namely, a court may only vacate an award:

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).

In addition to these four statutory grounds for the vacatur of an arbitration decision, the Fourth Circuit also recognizes two additional reasons based in common law. First, an arbitrator's decision may be overturned if it comprises a "manifest disregard of the law." Under this demanding standard, an appellant "is required to show that the arbitrators were aware of the

8

law, understood it correctly, found it applicable to the case before them, and yet chose to ignore it in propounding their decision." *Remmey v. PaineWebber, Inc.*, 32 F.3d 143, 149 -150 (4th Cir. 1994). Second, an arbitrator's interpretation of a contract might be set aside, but only if it fails to "draw its essence from the agreement." *Upshur Coals Corp. v. United Mine Workers, Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991). However, an arbitrator's decision does not "fail to draw its essence from the agreement" simply because the reviewing court disagrees with the interpretation of the contract made by the arbitrator. In fact, the Fourth Circuit has directed that a reviewing court should <u>not</u> "review the reasoning of the arbitrators in determining whether their work draws its essence from the contract, but look only to the result reached; the single question is whether the award, however arrived at, is rationally inferable from the contract." *Apex Plumbing Supply, Inc. v. U.S. Supply Co.*, 142 F.3d 188, 193 n.5 (4th Cir. 1998).

Neither the statutory grounds for vacatur nor those derived from the common law permit a court to overturn an arbitral award based on disagreement with the particular result reached by the arbitrators. Accordingly, a party may not seek a "second bite at the apple" simply because it desires a different outcome. "To permit such attempts would transform a binding process into a purely advisory one." *Richmond, Fredericksburg & Potomac R.R. Co., supra* at 282.

## III.   THIS COURT'S REVIEW IS NOT CONFINED TO PLAINTIFF'S DEFAMATION CLAIM.

UBS's argument begins with an assumption that is plainly inaccurate: that the entirety of the Panel's award of money damages is grounded in Plaintiff's defamation claim. As will be discussed below, the Arbitration Panel would have been justified in awarding compensatory damages based upon any number of Plaintiff's claims, including tortious interference with contractual relations, conversion or breach of duty of good faith and fair dealing. Although the Panel's award specifically stated that the statement made by UBS in the Form U5 was

defamatory (and only in Subsection 3 of the Award directing that Mr. Van Pelt's Form U5 be amended), that statement does not support the farfetched interpretation of the Award that UBS seeks to place on it – that the Panel made only "one finding of wrongdoing." It strains both logic and reason to contend that the Panel's specific mention of the defamatory language in the Form U5 compels a conclusion that the Panel rejected all of Mr. Van Pelt's remaining claims. Indeed, the Arbitration Panel was silent concerning the basis for its <u>monetary</u> award, and courts have long recognized that "the absence of an explanation does not signify that arbitrators acted in manifest disregard of the law." *O.R. Securities, Inc. v. Professional Planning Associates, Inc.*, 857 F.2d 742, 747 (11th Cir. 1988).

There are a number of reasons that this Court should reject the strained and limiting interpretation advanced by UBS. First, there is no requirement that an arbitration panel provide an explanation for its award. "It is well settled that arbitrators are not required to explain an arbitration award *and that their silence cannot be used to infer a ground for vacating the award. O.R. Securities, Inc.*, 857 F.2d at 747. Therefore, to protect against negative inferences being derived from an arbitrator's silence, an arbitration award that only contains a lump sum award is presumed to be correct." *Robbins v. Day*, 954 F.2d 679 684 (11th Cir.), *cert. denied*, 113 S.Ct. 201 (1992) (emphasis added); *see also Remmey v. Paine Webber, Inc.*, 32 F.3d 143, 151 (4th Cir. 1994) ("arbitrators need not state reasons for reaching a particular result.").

In its Motion to Vacate, UBS relies heavily on the lack of a "reasoned award" and seeks to use this as a basis to presume not only what the members of the Arbitration Panel decided but also their reasoning for their decision in favor of Mr. Van Pelt. Under controlling authority, however, it is improper for UBS or this Court to speculate what the Panel's reasoning might have been had it chosen to give an explanation for its award. UBS's Motion to Vacate fails to meet

the standard for vacatur and all presumptions are in favor of the validity of the award. Courts are reluctant to second-guess arbitrators' rulings and defer to them wherever possible. *Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998)("Indeed, 'a conclusion reached by the [arbitrator], even if questionable ... does not constitute exceeding [his] power.'"); *see also Anderman/Smith Co. v. Tennessee Gas Pipeline Co.*, 918 F.2d 1215, 1219, n.3 (5th Cir. 1990)("[T]his Court does not review the language used by, or the reasoning of, the arbitrators in determining whether their award draws its essence from the contract. ... The single question is whether the award, however arrived at, is rationally inferable from the contract.").

The difficulties faced by an unsuccessful party in having an arbitration award vacated when the Arbitration Panel has not provided a written opinion or explained its reasoning was discussed in *Merrill Lynch, Pierce, Fenner & Smith, Inc., v. Jaros*, 70 F.3d 418, 421 (6th Cir. 1995) ("If a court can find any line of argument that is legally plausible and supports the award then it must be confirmed."). This statement of the law was reflected by the Second Circuit Court of Appeals in *Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp.*, 103 F.3d 9, 12-13 (2d Cir. 1997) (citations omitted):

> When arbitrators decline to provide an explanation for their decision, a reviewing court can only infer from the facts of the case whether "the arbitrator[s] appreciate[d] the existence of a clearly governing legal principle but decide[d] to ignore or pay no attention to it." In such a case we must confirm the arbitrators' decision "if a ground for the arbitrator[s'] decision can be inferred from the facts of the case." This is so even if the ground for their decision is based on an error of fact or an error of law.

Under this standard, there is no basis that supports vacatur of the Award in favor of Mr. Van Pelt. It is unremarkable that the Arbitration Panel provided no reasoned opinion for its Award – it is not required to do so by law or by NASD Arbitration Rules, which governed the conduct of the arbitration under review.

The Securities Industry Conference on Arbitration ("SICA") Arbitrator's Manual (the "*Arbitrator's Manual*"), which the NASD provides to its Arbitration Panel Members as the rules for conducting the arbitration, expressly states: "Under present law, an arbitrator is not required to give a reason for the decision." *Arbitrator's Manual* at 32. A copy of this page from the *Arbitrator's Manual* is attached as Exhibit 2.

The Award is only required to contain certain information concerning the case, as reflected in NASD Code of Arbitration Section 10214 (attached as Exhibit 3).

> The arbitrator(s) shall be empowered to award any relief that would be available in court under the law. The arbitrator(s) shall issue an award setting forth a summary of the issues, including the type(s) of dispute(s), the damages or other relief requested and awarded, a statement of any other issues resolved, and a statement regarding the disposition of any statutory claim(s).

In short, there is no requirement for an Arbitration Panel to state its reasoning in deciding an award under NASD Dispute Resolution Rules and under binding caselaw. *Alexander v Gardner-Devener Co.*, 415 U.S. 36, 58 (1974) ("Arbitrators have no obligation to the court to give their reasons for an award.") In *Howsam v Dean Witter Reynolds*, 537 U.S. 79, 123 S.Ct. 588, 593 (2002), the United States Supreme Court determined in connection with an NASD arbitration that the execution of a Uniform Submission Agreement with the NASD effectively incorporated the NASD Code of Arbitration Procedure into the parties' agreement to arbitrate. All parties to this arbitration executed and submitted Uniform Submission Agreements to the NASD. R00002. By submitting the matter to arbitration, the parties agreed to abide by the rules of the forum and thus contractually agreed to the abbreviated form of award here under review.

In *Arbitration Procedures*, another SICA publication that the NASD provides to persons seeking to initiate an arbitration, parties are expressly advised that they may seek a reasoned award. *Arbitration Procedures* states:

Arbitrators are not required to write opinions or provide reasons for the award. A party, however, may request an opinion. This request should be made no later than the hearing date. ... The decision of the arbitrators is final; that is, the decision is subject to review by a court only on a very limited basis.

*Arbitration Procedures* at 26 (attached as Exhibit 4).

Neither party to this arbitration requested that the Arbitration Panel provide reasons for its award. UBS waived this opportunity and should not now be heard to complain about the lack of a reasoned award. *See e.g. Hilb Rogal & Hobbs Co. v. Golub*, 2006 WL 2403390 at *3 n.2 (E.D. Va. 2006)(noting that neither party requested a reasoned award under the relevant rules).

That the Award contained little by way of calculation or explanation is not unusual. In fact, it is rare for an arbitration panel operating under the rules of the NASD to provide a written explanation for its decision. In the course of its review of an NASD award, one district court recently noted the rarity of any reasoned explanation in NASD arbitration awards, pointing to statistics that show that more than 95% of such awards contain no explanation:

> The explanation for the award in this case was one sentence. By itself, is that unusual or improper? Based on several recent articles on the subject, the answer is no. First, there is apparently no current NASD rule that requires arbitrators to provide *any* explanation for their award, although this issue is the subject of some debate and the NASD is apparently considering a new rule that would require some minimal explanation. *See* Steven C. Bennett, *Explained Awards In Arbitration: The NASD's Proposed Experiment,* 61 APR Disp. Resol. J. 15, * 16 (Feb-April 2006) ("The NASD Code of Arbitration Procedure [ ] does not now require arbitrators to produce 'reasoned' awards or even to briefly explain the basis for the decision."). Second, the great majority of NASD awards contain *no* explanation for the decision. *See* Jennifer J. Johnson, *Wall Street Meets The Wild West: Bringing Law and Order To Securities Arbitration,* 84 N.C. L. Rev. 123, 144-45 (2005) (in 2003 and 2004, fewer than 5% of the NASD arbitration decisions contained "even a brief explanation of the panel's decision"). Viewed in this context, the one-sentence explanation in this case is longer than the typical award. Third, the Seventh Circuit has held that a Court may not vacate an arbitration award under the FAA on the ground that it contained no explanation for the decision. *See Eljer Mfg., Inc. v. Kowin Dev. Corp.,* 14 F.3d 1250, 1254 (7th Cir.1994) (an arbitrator is "simply not required to state the reasons for his decision" because such a requirement would "serve only to perpetuate the delay and expense which arbitration is meant to combat"). Based on the Seventh

Circuit's decision in *Eljer,* the award in this case would have been immune from any challenge if the arbitrators had simply stopped after the first sentence.

*Wachovia Securities, LLC v. Barnes*, 2006 WL 1371449 *3 (N.D. Ill. 2006).

UBS urges this Court to conclude that the Panel's silence concerning Mr. Van Pelt's specific claims of tortious interference with contractual relations, civil conspiracy, conversion or breach of duty of good faith and fair dealing (among other claims) necessarily means that the Panel ruled in UBS's favor on those claims. This is nonsense. First, UBS's argument runs afoul of the rule that directs that an arbitrator's "silence cannot be used to infer a grounds for vacating the award." *O.R. Securities, Inc.,* 857 F.2d at 747. That is precisely the inference that UBS urges the Court to make – that the award should be overturned because it is silent as to the specific grounds for monetary relief.

In addition to the defamation claim, there was substantial evidence that UBS sought to rid itself of Mr. Van Pelt's services while still retaining his substantial client base. To this end, the firm contrived a basis for Mr. Van Pelt's discharge, leveled baseless allegations of suspicious trading that interfered with his ability to find new employment, gave false information to Mr. Van Pelt's clients and made substantial efforts to contact Mr. Van Pelt's clients and persuade them to abandon him in favor of UBS employees. Thus, the evidence presented to the Arbitration Panel would have supported a substantial monetary award on the basis of any number of the legal theories that Mr. Van Pelt relied upon.

In conclusion, this Court should not consider the result reached by the Arbitration Panel only through the narrow lens of Mr. Van Pelt's defamation claim. UBS's interpretation of the award is both absurd and, more important, contrary to the analytical framework that this Court is bound to follow – *i.e.* reserving vacatur of an arbitration award for only those extraordinary cases in which a manifest disregard of the law is supported by <u>evidence,</u> not <u>inference.</u>

## IV.   THE ARBITRATION PANEL HEARD AND REJECTED THE DEFENDANT'S CLAIM THAT ITS STATEMENT ON THE FORM U5 WAS TRUTHFUL.

UBS was afforded a full and fair opportunity to present to the Arbitration Panel its argument that the statement that it placed on the Form U5 was not defamatory because it was truthful. The Panel rejected UBS's defense and ordered substantial revisions to the Form U5 as part of its award. Before this Court, UBS again argues the truthfulness of its Form U5 statement, couched in terms of the "irrationality" of the Panel's award. This Court should reject UBS's attempt to re-litigate its defense to Mr. Van Pelt's defamation claim: apart from UBS's disagreement with this aspect of the arbitral ruling, there is no evidence that the Panel departed from standard defamation law in reaching its decision.

More specifically, UBS exhibits a disingenuous lack of candor when it claims that the Form U5 amendments ordered by the Panel implicitly reflect a finding that UBS's stated reason for Mr. Van Pelt's termination was "truthful" and therefore not defamatory. A comparison of UBS's original statement and the amended statement ordered by the Arbitration Panel serves to demonstrate the frivolousness of this argument:

| Original Statement | Revised Statement |
|---|---|
| "Concerns about conduct regarding transactions at and near the close in a customer's account." | "Concerns about conduct regarding transactions at and near the close in a customer's account following an internal investigation." |
| | "The securities and Exchange Commission ("SEC") conducted an investigation regarding the transactions. The SEC did not initiate any enforcement action against Mr. Van Pelt following the conclusion of its investigation." |
| | "[A] panel of arbitrators did not find evidence of misconduct by Mr. Van Pelt during the consideration of his claim against UBS for wrongful termination." |

Contrary to UBS's argument that the Panel's award supports the "truthfulness" of its stated reasons for Mr. Van Pelt's departure, the amendments ordered by the Panel cast substantial doubt as to the veracity of UBS's original statement and/or the sincerity of UBS's internal investigation. Moreover, the fact that the amendment ordered by the Panel explains that Mr. Van Pelt was exonerated by both the SEC and the Arbitration Panel in the course of a claim for wrongful discharge places into high relief the lack of credibility of UBS's original statement. Finally, UBS's current attempt to justify its Form U5 statement as "truthful" is contradicted by its earlier stipulation that it had not "found or concluded" that Mr. Van Pelt had engaged in any market manipulation and was not terminated for such conduct. Thus, even if the Court were to accept UBS's assumption that the monetary award was based solely on the defamation claim, UBS's argument still falls short of demonstrating the "irrationality" of the Panel's decision.

Moreover, the Form U5 statement was revised in precisely the manner recommended by Plaintiff's expert witness Robert Lowry, a former employee of the Securities and Exchange Commission with nearly 30 years' experience. He testified that part of his duties at the SEC required him to review Forms U5 to determine if they accurately represented the events leading to termination. Tr. tape 13, 11:14-25. Mr. Lowry testified at length concerning the need for accurate reporting on the Form U5 and the inaccuracies contained in the Form U5 filed by UBS. Tr. tape 13, 24-26. Mr. Lowry specifically noted that UBS failed to check the "yes" box in the Disclosure Reporting Page ("DRP") Question 7B, indicating whether Mr. Van Pelt was under internal review for "fraud, for wrongful taking of property, for violating investment-related statutes, regulations, rules or industry standards of conduct." Tr. tape 13, 25:24-26:13. From his review Mr. Lowry concluded:

> So what's missing is the correct answer to that question. More importantly, full information on the DRP about what happened. So what is on the front of the form

is not complete, and what is ... required on the second page is omitted. And no one, not knowing what happened, would have any reason to know, or be able to tell, whether that was filled out correctly or not.

Tr. tape 13, 26:12-20.

Mr. Lowry also testified that high quality broker-dealers would not consider employing a broker, such as Mr. Van Pelt, who had a history of questionable trades as reflected in the Form U5 filed by UBS. Tr. tape 13, 29:8-10. UBS offered no testimony from an expert witness to contradict Mr. Lowry's testimony so it is uncontested.

UBS's argument that the Form U5 statement is "truthful" also ignores one of its most revealing concessions made in the course of the hearing. On the third day of the hearing, Plaintiff called Mr. Lowry to testify concerning (1) what UBS had to prove to support its Form U5 statement that Mr. Van Pelt manipulated the market in his customer's account and (2) the shortcomings of UBS's so-called internal investigation into Mr. Van Pelt's alleged market manipulation. In an apparent effort to deflect the impact of Mr. Lowry's testimony criticizing its internal investigation and to prevent Mr. Lowry from testifying about the allegation of market manipulation, counsel for UBS offered the following stipulation:

> In the interest of time, ... the Respondents in this matter, UBS Financial Services, Inc. and Michael Williams, hereby stipulate that neither Respondent found or concluded that Wells Van Pelt in fact manipulated the closing price or inside bid price of Information Architects stock in May or June of 2002, and that the Respondents stipulate that Mr. Van Pelt was not terminated in whole or in part on a conclusion that the Information Architects stock was in fact manipulated.

Tr. tape 12, 34:12-19.

It is indeed difficult to reconcile this astonishing stipulation that Mr. Van Pelt was not guilty of or terminated for market manipulation with UBS's current position that the statement placed in the Form U5 (that he was terminated for "concerns about conduct concerning transactions at or near the close") is truthful. The members of the Arbitration Panel – individuals

experienced in the securities industry – were all aware that a termination based upon suspicious "transactions at or near the close" was tantamount to an allegation of market manipulation. UBS's stipulation that Mr. Van Pelt was neither guilty of or terminated for such misconduct constituted a powerful concession that the firm's stated reason for Mr. Van Pelt's departure was factually baseless.

In the Award, the Arbitration Panel required UBS to provide accurate information concerning its termination of Mr. Van Pelt, by allowing UBS to repeat its language for discharging him but requiring a full explanation of the circumstances and to state that both the SEC and the Arbitration Panel found UBS's stated reason to be factually unsupported. The Panel also required UBS to correct DRP Question 7B to indicate that an investigation was pending and to give "complete details regarding the internal review." R00005.

In sum, this Court must presume that the Panel knew exactly what it was doing in rendering its Award. The Court must presume that the Award is not "irrational," but instead was the result of the Panel's acceptance of Mr. Lowry's recommendation that the Form U5 be amended to be accurate and complete. The attack leveled by UBS on this aspect of the arbitration award falls far short of the required showing to demonstrate a "manifest disregard of the law." The truthfulness of its Form U5 statement was fully considered by the Panel. UBS's disagreement and dissatisfaction with the Panel's resolution of this issue is not a legitimate basis for the extraordinary relief that UBS demands.

## V.  THE ARBITRATION PANEL HEARD AND REJECTED UBS'S CLAIM THAT ITS FORM U5 STATEMENT WAS SUBJECT TO AN ABSOLUTE PRIVILEGE.

UBS was afforded a full and fair opportunity to present to the Arbitration Panel its argument that the statement that it placed on the Form U5 was not actionable because it was subject to an absolute privilege. The Panel rejected UBS's defense. Before this Court, UBS

again argues that its Form U5 statement was subject to an absolute privilege, dressing up its argument in the guise of a claim that the Panel's decision is contrary to a "well-defined public policy." See Defendant's Memorandum Sec. II.E, pp. 20-25.

### A.    The Award Implicates No Public Policy Concerns.

UBS wildly overstates a court's power to upset an arbitration award that is deemed "contrary to public policy." Contending that a court "enjoys more latitude" in conducting "*de novo*" review of an arbitrator's conclusions, UBS urges the Court to essentially re-examine the issue whether statements made in a Form U5 are cloaked with an absolute privilege. UBS's attempt to phrase its argument as a matter of "public policy," however, is no more than "a thinly disguised attempt to reargue the merits of the claim." *Widell v. Wolf*, 43 F.3d 1150, 1151 (7th Cir. 1994). The Court should reject UBS's invitation to wade into the merits of this issue yet again.

The doctrine that a court can refuse to enforce an arbitration award that is contrary to public policy is a principle derived from "the basic notion that no court will lend its aid to one who founds a cause of action upon an immoral or illegal act." *United Paperworkers International Union v. Misco, Inc.*, 484 U.S. 29, 42 (1987). A district court can vacate an arbitration award on the basis of public policy only if there is (1) a violation of "some explicit public policy," and (2) the award explicitly conflicts with "law and legal precedents," as opposed to "general considerations of supposed public interests." *Misco*, 484 U.S. at 44. For "public policy" grounds to be implicated, the challenging party must first demonstrate the existence of "a 'well-defined and dominant' policy embodied in laws and judicial precedent." *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995). Finally, in reviewing an arbitration award that is challenged on public policy grounds, the court "takes the facts as found by the arbitrator." *Board*

*of County Commissioners v. L. Robert Kimball and Associates*, 860 F.2d 683, 686 (6th Cir. 1988), *cert. denied*, 494 U.S. 1030 (1990).

**B.      The Public Policy On Which UBS Relies Is Not "Dominant".**

UBS claims that the "explicit public policy" implicated by the Award is the requirement that the firm complete the Form U5 in an accurate manner, including the requirement that an explanation for Mr. Van Pelt's termination be given. The Panel, however, ruled that the explanation provided by UBS was "defamatory" and required UBS to substantially revise the explanation provided – essentially adding a statement to the effect that Mr. Van Pelt was exonerated from any wrongdoing, notwithstanding the conclusions of UBS's "internal investigation."

UBS claims that the "explicit public policy" concerning its statements in the Form U5 finds support in a line of cases that have held such statements to be protected by an absolute privilege. Defendant's Memorandum at 22-23. UBS cites only those few New York decisions finding an absolute privilege for such statements. However, numerous courts have found otherwise, rejecting the notion that an absolute privilege attaches to statements made in a Form U5. *Dickinson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 431 F.Supp.2d 247, 262 (D.Conn. 2006) (holding that statements on Form U5 are not entitled to absolute privilege under Connecticut law); *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1163-64 (7th Cir. 1998) (holding that reports of customer complaints on Form U5 are not protected by absolute privilege under Illinois law); *Glennon v. Dean Witter Reynolds, Inc.*, 83 F.3d 132, 136-37 (6th Cir.1996) (holding that statements on Form U5 are not entitled to absolute privilege under Tennessee law); *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704, 708 (7th Cir.1994) (holding that Form U5 statements listing reasons for termination are not protected by absolute privilege under

20

Illinois law); *Fahnestock & Co., Inc. v. Waltman,* 935 F.2d 512, 516 (2d Cir.1991) (upholding arbitration award where arbitrators held that statements on Form U5 are protected by qualified, but not absolute, privilege under New York Law); *Acciardo v. Millennium Securities Corp.,* 83 F.Supp.2d 413, 419-421 (S.D.N.Y. 2000) (same).

Most of these decisions proceed from a rejection of the Form U5 reporting process as a "quasi-judicial proceeding," contrary to UBS's assertions. *See Baravati,* 28 F.3d at 708 ("the submission of a U5 form and its transmission (upon request) to members of the NASD are not stages in the association's quasi-judicial regulatory process."); *Acciardo,* 83 F.Supp.2d at 419 (same); *Dickinson,* 431 F.3d at 262 (same).

The unsettled nature of the privilege issue in New York caselaw was the subject of a recent case in the Second Circuit Court of Appeals, *Rosenberg v. MetLife, Inc.* 453 F.3d 122 (2d Cir. 2006). In *Rosenberg,* a former employee filed a defamation claim against MetLife for statements made in a Form U5. The district court entered summary judgment in favor of the former employer, ruling that the statements were subject to an absolute privilege under the law of New York. On appeal, the Second Circuit noted the importance of the issue and the differing results reached by the state and federal courts that had been called upon to decide whether a qualified or absolute privilege attached to statements made in a Form U5. 453 F.3d at 125-27. Because resolution of the privilege issue would be determinative of Mr. Rosenberg's claims, and because the court of appeals concluded that the issue was one of importance and continuing controversy, it certified the issue to New York's highest court. 453 F.3d at 128-29.

> We conclude that this case turns on an unsettled and important question of New York law: Are statements made by an employer on a Form U-5 subject to an absolute or a qualified privilege? We certify this question to the New York Court of Appeals.

The *Rosenberg* court cites a number of policy reasons *not* to grant an absolute privilege that were also discussed in Mr. Van Pelt's Memorandum in Opposition to Respondents' Motion to Dismiss, relying on Judge Ellerin's dissent in *Cicconi v. McGinn, Smith & Co.*, 27 A.D.3d 59, 808 N.Y.S. 604, 608-09 (1st Dep't 2005), which concludes that the "*Herzfeld* case was incorrectly decided." *Id.* at 608 ("the cloak of absolute privilege has generated substantial abuses by way of distorted and false filings for tactical, competitive business reasons, without any realistic recourse available to those injured.") R01662-01664.

Perhaps the most compelling reason to withhold an absolute privilege from the contents of a Form U5 – a reason that has particular relevance to Mr. Van Pelt's claim – was stated by Judge Posner in *Baravati v. Josephthal, Lyon & Ross, Inc.*, 28 F.3d 704 (7th Cir. 1994):

> To insulate the members from liability for the contents of their U-5s would be tantamount to allowing a member of the NASD to blackball a former employee from employment throughout the large sector of the industry that the membership of the association constitutes.

*Baravati*, 28 F.3d at 708; *see also Acciardo*, 83 F.Supp.2d at 419 (stating that "derogatory or false Form U5 statements can effectively 'blackball' a broker from the industry.").

This is the situation that would exist in North Carolina if this Court accepts UBS's argument – Mr. Van Pelt could be wrongfully blackballed from the industry based upon an accusation that both the SEC and the Arbitration Panel found to be factually baseless. UBS has cited no law other than those few opinions decided under New York law that favor its argument and holding that an employer has an absolute privilege for statements made on a Form U5. Due to the unsettled state of New York law on this very issue, there is no compelling reason for this court to accept this controversial, aberrant position as a statement of "dominant" public policy.

The NASD disagrees with UBS's position that it is entitled to an absolute privilege that would prevent recovery by a registered representative for defamatory statements on a broker's Form U5. Claimant's Response to Reply Brief Concerning Motion to Dismiss, discusses SEC Release No. 34-39892, which further supports the Arbitration Panel's rejection of UBS's position that it is entitled to an absolute privilege for statements made on Mr. Van Pelt's Form U5. In SEC Release No. 34-39892, proposing the Rule, the SEC expressly states:

> A member must make truthful and accurate statements on the covered forms required under Article V, Sections 2 and 3 of the By-Laws.

1998 WL 191359 *3. R00188.

As further noted in SEC Release No. 34-39892 in connection with proposed Rule 1150, which would grant broker-dealers only a "qualified privilege":

> Most state court decisions that have considered this issue in the Form U-5 or in similar contexts have adopted a qualified immunity standard.

1998 WL 191359 *3. R00191.

Moreover, North Carolina law is in closer alignment with the courts that have found only a qualified privilege, than with the New York decisions cited by UBS. For example, the court in *Baravati* noted that, although the employer has a *qualified* privilege to defame its former employee on a Form U5, that "privilege is forfeited (under Illinois law) only if the firm knows or is reckless in failing to discover that it is defaming him falsely." *Id.* (emphasis added). North Carolina law also recognizes that a qualified privilege is lost if the defamatory statement is made "with knowledge that it was false, with reckless disregard for the truth or with a high degree of awareness of its probable falsity." *Clark v. Brown*, 99 N.C. App. 255, 263, 393 S.E.2d 134, 138, *disc. rev. denied*, 327 N.C. 426, 395 S.E.2d 675 (1990) (emphasis added).

UBS has failed to show that the award of the Arbitration Panel runs contrary to any "dominant" public policy. Both sides of the absolute privilege argument were made by the parties in the context of UBS's Motion to Dismiss and were fully considered by the Arbitration Panel. There is no basis in "public policy" for vacating the Arbitration Panel's decision.

### C.     The Public Policy On Which UBS Relies Is Not "Well-Defined".

For UBS to establish the applicability of the narrow "public policy" grounds for challenging an award, it must not only demonstrate that the relevant policy is dominant, but also that it is "well-defined and ... embodied in laws and judicial precedent." *PaineWebber, Inc. v. Agron*, 49 F.3d 347, 350 (8th Cir. 1995). The public policy that UBS cites – generalized notions of truthful reporting in the securities industry – does not qualify as a "well-defined" public policy. In past cases, courts have rejected arguments that statutes and regulations governing the securities industry can form the basis of such a "well-defined and dominant" policy. In *PaineWebber, Inc. v. Agron*, for example, a PaineWebber employee was terminated for signing a customer's name on a form and attempting to pass it off as an original – a clear violation of NASD rules and PaineWebber's own policies. After an NASD arbitration panel awarded the employee substantial damages arising from his termination, PaineWebber sought to have the award vacated on public policy grounds. The district court confirmed the award. The Eighth Circuit affirmed, holding that NASD rules and PaineWebber policies requiring honesty in the securities industry, while providing some "narrow guidance" for a public policy, were insufficient to serve as a "'well-defined and dominant' policy embodied in laws and judicial precedent" and thus justify the extraordinary relief sought by PaineWebber. "Having identified only a general policy relating to honest conduct and its own clearly defined internal rules as a reason for striking down the arbitration ruling, PaineWebber's challenge must fail. To adopt this

24

position would violate our mandate under *Misco* and *W.R. Grace [& Co. v. Local Union 759, 461 U.S. 757 (1983)]*." 49 F.3d at 351.

Such is the case here. The alleged "public policy" relied upon by UBS – that it is required to be truthful in its NASD reporting – constitutes no more than "general considerations of supposed public interests" that fall short of the compelling and specific policy required for the invocation of this narrow legal principle. *Misco*, 484 U.S. at 44.

A similar result was reached by the court in *Prudential Bache Securities, Inc. v. Tanner*, 72 F.3d 234 (1st Cir. 1995), where the court, while eschewing any ruling whether SEC and NASD reporting requirements established an explicit public policy, held that there was no demonstration that a violation of the policy could "be clearly shown" by the arbitration award. 72 F.3d at 242 (quoting *Misco*). Such is the case here, where UBS's argument hinges on a "finding" that the Arbitration Panel never made – that the statement made by UBS on the Form U5 is accurate and "truthful." In fact, Mr. Lowry's uncontested testimony expressly rebuts UBS's claim of "truthfulness." *See* Sec. IV, *infra*.

In sum, UBS has failed to demonstrate either of the two elements necessary for the invocation of vacatur on grounds of public policy: UBS has not established that a "well-defined and dominant" public policy is implicated by the facts of this case; nor has UBS "clearly shown" that the arbitration award in this case does violence to any such public policy. Public policy provides no basis for upsetting the award.

## VI. THE ARBITRATION PANEL HEARD AND REJECTED UBS'S CLAIM THAT THE FORM U4 SERVED AS A RELEASE OF PLAINITFF'S DEFAMATION CLAIM.

UBS was afforded a full and fair opportunity to present to the Arbitration Panel its argument that the statement that it placed on the Form U5 was not actionable owing to terms

contained in Mr. Van Pelt's Form U4. The Panel rejected UBS's defense. Before this Court, UBS devotes nearly one-third of its memorandum to arguing this issue once again. Defendant's Memorandum pp. 9-16. Claiming that the Arbitration Panel "exceeded their powers" in rejecting its argument, UBS asserts that the arbitrator's award "fails to draw its essence from the agreement." *Id.* at p. 9-10. As with the other challenges made by UBS, this issue was given full consideration by the Arbitration Panel. Their resolution of it was not unreasonable. The Court should therefore reject UBS's demand that the award be vacated because of the Panel's implicit rejection of UBS's "release" argument.

UBS claims that the Arbitration Panel exceeded its powers by failing to give conclusive effect to the so-called "release" contained in the Form U4 signed by Mr. Van Pelt. Defendant's Memorandum p. 10-11. It is instructive that UBS can point to no support in the caselaw for its claim that the language found in the Form U4 would act as a bar to a former employee's defamation claim. There is no court that has so held. To the contrary, Plaintiff's counsel provided the Arbitration Panel with a case from the New York Supreme Court that dismissed this very argument. *See* Plaintiff's Memorandum in Opposition to Respondents' Motion to Dismiss p. 16-17, Ex. J (R00130-160). In that case, *Marais v. Barclays de Zoete Wedd Inc.*, 02/121088 (Sup. Ct. N.Y. 2003), the court held that to accept the defendant's argument concerning the effect of the release contained in the Form U4, "it would be impossible for any employee to prevail on a U5 defamation or tortious interference claim, which is not the case."

Generally speaking, employers have only a qualified privilege when commenting about a former employee. As to UBS's claim that the Form U4 acts as a release of any claim of defamation in this context, there are many instances to be found in the caselaw where courts have examined – and rejected – the effectiveness of similar releases. *Kellums v. Freight Sales*

*Centers, Inc.*, 467 So.2d 816, 818 (Fla.App. 1985) (release contained in employment application did not bar defamation action against former employer); *Walsh v. Consolidated Freightways, Inc.*, 563 P.2d 1205, 1210 (Or. 1977) (release contained in employment application did not alter the former employer's *qualified* privilege to comment upon plaintiff's work record).

In addition to these authorities, the Arbitration Panel also heard the testimony of expert witness Robert Lowry concerning the "release" issue. On cross-examination, Mr. Lowry, who spent almost 30 years at the Securities and Exchange Commission, testified unequivocally that the language on the Form U4 does <u>not</u> provide a former employer with a unqualified release by reason of information that may have been reported by that employer on the U5. Tr. tape 14, 64:18-65:3. Mr. Lowry testified:

> It's to enable a firm to provide with candor the reasons for terminations and any disciplinary actions. However, any information that's false or misleading, there is no release implied in that language. ... But the importance was that firms were expressing reluctance about filing [the Form U5.] They were giving out information about employees; they were afraid that they could use it for violating privacy rights.

Tr. tape 14, 65:1-13.

Mr. Lowry's testimony was clear that the provision was never intended to shield false or defamatory statements made on a Form U5:

> Firms were obligated to make complete and thorough ... disclosures on these forms. ... [I]t wasn't to provide a pass for whatever was put; it had to have a basis in fact before it could be placed on the form.

Tr. tape 14, 65:18-22.

This view of the language in the Form U4 comports with those cases addressing the effect of a release contained in an employment application. "A reasonable construction of the release is that it acts to absolve [a former employer] for dissemination of pertinent information <u>having a reasonable basis in fact</u> about [an applicant] to prospective employers." *Kellums*, 467

So 2d at 818 (emphasis added); *see also Walsh*, 563 P.2d at 1210-11 (quoting *Prosser* as stating that the qualified privilege "is lost if the defamer does not have reasonable grounds, or 'probable cause' to believe it to be true ...."). Based on the briefing of the issue by the parties and Mr. Lowry's testimony at the hearing, the Arbitration Panel had a strong basis for declining to adopt the position advanced by UBS. Mr. Lowry's testimony concerning the inadequacy of UBS's investigation (Tr. tape 13, 21:6-25, 22:6-20) and the argument contained in the Claimant's Memorandum in Opposition to Respondents' Motion to Dismiss (R01666-01667) disproves UBS's argument that the Arbitration Panel's Award ignored the language of the Form U4. As with the other issues raised by UBS, the Arbitration Panel fully considered UBS's argument and rejected it.

Unlike the situation in *Patten v. Signator Insurance Agency, Inc.*, 441 F.3d 230 (4th Cir. 2006), cited by UBS, the Arbitration Panel had a reasonable basis for rejecting UBS's argument, rooted in both the legal position articulated by Plaintiff's counsel and the historical background provided by Mr. Lowry. The Court should reject UBS's claim that the Arbitration Panel ignored important contract terms. To the contrary, it is clear that the Panel heard competing legal arguments from Plaintiff and Defendant and decided the issue in Plaintiff's favor.

## VII. THE AWARD IS NOT SUBJECT TO VACATUR EVEN IF THIS COURT FINDS THAT UBS'S LIABILITY MAY BE BASED ON A FINDING NOT SPECIFICALLY DISCUSSED IN THE AWARD.

As previously stated, in the absence of a reasoned award, UBS cannot credibly conclude that the award of the Arbitration Panel was based upon defamation alone. It is clear that there is also ample authority and evidence supporting each of the remaining causes of action alleged in the Statement of Claim. UBS argues that the Panel's Award must be vacated because it "contradicts the explicit and unambiguous terms of the parties' agreements." Defendant's Memorandum p.

25-26. This naked allegation is insufficient, however, because it is equally plausible that the Panel rejected these contract terms as overreaching or oppressive, a position that was argued in Claimant's Memorandum in Opposition to Respondents' Motion to Dismiss, with citation to North Carolina case law:

> North Carolina courts will not "blue line" a contract to delete unenforceable provisions, *i.e.* modify or rewrite the covenants in order to make it enforceable.

R 01673.

Courts in North Carolina routinely refuse to enforce or reform overreaching terms contained in employment contracts. *Hartman v. W. H. Odell and Assoc., Inc.*, 117 N.C. App. 307, 450 S.E.2d 912, 917 (1994) (If the territory is too broad, "the entire covenant fails since equity will neither enforce nor reform an overreaching covenant."); *Masterclean of North Carolina, Inc. v. Guy*, 82 N.C. App. 45, 345 S.E.2d 692, 696 (1986) ("We hold that ... the court was without the power to vary or reform the contract by reducing territory."); *accord, Heartland Securities Corp. v. Gerstenblatt*, 2000 WL 303274 at *10 (S.D.N.Y. 2000) (Denying partial enforcement of employment contracts because "Heartland has failed to demonstrate that it did not overreach or use dominant bargaining power in reaching the agreements with defendants.")

There is no evidence to disprove that the Panel found some provision in both the alleged contracts cited by UBS – UBS's Employee Handbook and the Promissory Note – to be unenforceable. UBS itself admits this, stating that "[t]he Panel also failed to discuss the critical contract terminology set forth in the parties' agreements." Defendant's Memorandum p. 26. This absence of evidence, standing alone, is sufficient to undermine UBS's argument that an acknowledgment in the Promissory Note or the Employee Handbook, stating that Mr. Van Pelt was an at-will employee prohibits a finding of wrongful termination. *Id.* The Panel's silence leaves open the possibility of alternative explanations supporting the Award. For example, the

Panel may well have found that these agreements contained "unenforceable provisions," hence it was not compelled to "blue line" the agreement for purposes of enforcing an at-will employment provision.

In addition, Plaintiff relied upon two Court of Appeals cases (R 01376-7) in alleging that "when wrongful termination claims are not specifically excluded under the parties' arbitration agreement, arbitrators have the power to grant such claims even if an 'at will' doctrine would not permit such claims," citing *Shearson Haydon Stone v. Liang*, 653 F.2d 310, 312-313 (7th Cir. 1981) ("It has been held repeatedly that an agreement to arbitrate disputes about employee discharges implies a requirement that discharges be only for 'just cause.'"), and *PaineWebber v. Agron*, 49 F.3d 347, 352 (8th Cir. 1995) (The requirement to arbitrate "necessarily alters the employment relationship from at-will to something else – some standard of discernible cause is inherently required in the context where an arbitration panel is called on to interpret the employment relationship. ... Accordingly, the arbitration panel has the power to determine whether the firing was justified.").

At the arbitration hearing, and after Mr. Van Pelt had rested his case, UBS's counsel made an oral motion to dismiss on the basis of at-will employment, which the Arbitration Panel denied.[3] At that time, Plaintiff's counsel provided the Arbitration Panel with additional case law supporting the arbitrators' equitable power to require "just cause" in a wrongful termination case that is submitted to arbitration. The Arbitration Panel later requested that copies of the cases be provided for its review. These cases include the two referenced above, as well as *DeLuca v. Bear Stearns & Co.*, 175 F.Supp.2d 102, 109 (D. Mass. 2001) ("[A]t least three circuits have held that an agreement to arbitrate employee termination may vitiate an employee's at-will

---

[3] Regrettably, the majority of the argument made by Plaintiff's counsel in opposition to UBS's motion to dismiss is missing from the transcript. Tr. tape 20, 9:15 (noting "Tape 20 stops; side B is blank.")

status."), *Advest, Inc. v. McCarthy*, 914 F.2d 6, 10-11 (1st Cir. 1990) ("[A]rbitrators possess latitude in crafting remedies as wide as that which they possess in deciding cases . . . That leeway is at its zenith when, as here, the arbitration clause imposes no limitations on the choice of remedies."); and *Pierce v. Shearson Lehman Hutton, Inc.*, 1990 WL 60751 *2 (N.D. Ill. 1990) ("An agreement to arbitrate disputes about employee discharges implies a requirement that discharges be for 'just cause.'").

Based on the equitable powers of the Arbitration Panel, as well as caselaw provided to the Arbitration Panel by counsel for Plaintiff, the Arbitration Panel could have reasonably concluded that UBS failed to show just cause for terminating Mr. Van Pelt's employment, notwithstanding its argument concerning at-will employment.

In addition, and in response to UBS's argument contained in its Motion to Dismiss – that the Arbitration Panel did not have the power to award damages for wrongful termination – Exhibits A-J to Mr. Van Pelt's Memorandum in Opposition to Respondents' Motion to Dismiss consist of arbitration awards (R00071-00161) in which arbitration panels exercised their equitable powers to award damages for wrongful termination, as did the arbitration panels in *PaineWebber v. Agron, supra* and *Shearson Haydon Stone v. Liang, supra.*

**A.**     **Negligent Infliction of Emotional Distress Was Addressed in Both the Statement of Claim and Claimant's Memorandum in Opposition to Respondents' Motion to Dismiss.**

The Arbitration Panel's equitable powers and other arguments previously discussed addressing UBS's reliance on the Form U4 signed by Mr. Van Pelt, support an Award based on Negligent Infliction of Emotional Distress as set forth in the Statement of Claim. UBS's argument that Mr. Van Pelt is bound by a release in the Form U4 (Defendant's Memorandum p. 28) is unavailing for the reasons set forth in Sec. VI, *infra.* In addition, Plaintiff's Statement of

Claim, Tenth Cause of Action sets forth the necessary elements under North Carolina law to support this claim. R01383. The only issue raised by Respondents' Motion to Dismiss related to satisfaction of pleading requirements set forth in *Buser v. Southern Food Services,* 73 F.Supp.2d 556 (M.D.N.C. 1999). Mr. Van Pelt's counsel responded by detailing the damages caused to Mr. Van Pelt by UBS's conduct, sufficient to satisfy *Buser's* notice pleading requirements. R01679-01680.

**B.      Tortious Interference with Contractual Relationships and Related Causes of Action Were Addressed in Both the Statement of Claim and Claimant's Memorandum in Opposition to Respondents' Motion to Dismiss.**

As argued before the Panel in Claimant's Memorandum in Opposition to Respondents' Motion to Dismiss, four causes of action in Mr. Van Pelt's Statement of Claim were based upon UBS's actions in interfering with his ability to contact the more than 800 customers that Mr. Van Pelt brought with him to UBS. Third Cause of Action: Intentional Interference with Prospective Contractual Relationships, Sixth Cause of Action: Tortious Interference with Contractual Relationships, Seventh Cause of Action: Breach of Duty of Good Faith and Fair Dealing, and Eighth Cause of Action: Conversion. R01378-79, 01381-82.

As counsel cited to the Arbitration Panel, support for these claims is shown by NASD guidelines that prohibit broker-dealers from preventing customers from transferring their accounts to a broker's new firm. R01378-01379; R01381-01382. Claimant's Memorandum In Opposition to Respondents' Motion to Dismiss also discusses this issue. R01667-01674. Finally, Plaintiff cited North Carolina caselaw holding that a claim for tortious interference with prospective economic advantage may be stated where "the defendants acted without justification in 'inducing a third party to refrain from entering into a contract with them which contract would have ensued but for the interference.'" *Walker v. Sloan,* 137 N.C.App.387, 529 S.E.2d 236, 241-

42 (2000). In *Owens v. Pepsi Bottling Co*, 330 N.C. 666, 412 S.E.2d 636, 644 (1992), the North Carolina Supreme Court made clear that this cause of action "may be based on conduct which prevents the making of contracts." Plaintiff also presented evidence that other arbitration panels in cases similar to Mr. Van Pelt's have found in favor of the broker when the broker-dealer subjects the broker to a contract of adhesion, such as the Promissory Note, which asserts ownership of all of the customers that Mr. Van Pelt had brought with him to UBS from Smith Barney, and thereafter seeks to prevent him from any contact with the customers following termination of his employment with UBS.

In addition to contradicting North Carolina state law, UBS's position fails to acknowledge that an NASD arbitration panel, employing principles of equity, may choose not to enforce "contracts of adhesion lacking in mutuality among other things, and therefore, this Panel undertakes to determine fairness under the specific facts and evidence of this case in light of the equitable nature of the remedy sought." *PaineWebber v. A.G. Edwards and Aiken*, NASD Case No. 02-01306 (R00122, attached as Exhibit 5). The *Aiken* decision further finds that "nothing shall be construed to restrict the rights of any clients to transfer their accounts freely among brokerage firms," which is "in keeping with the intent of NASD Notice to Members 02-07." R00122. The *Aiken* Panel found the "non-compete provision … void and unenforceable." R00123. Claimant argued this in opposition to Respondents' Motion to Dismiss and the Panel may well have reached the same conclusion that the *Aiken* Panel reached concerning the non-compete provision in the Promissory Note. R01670.

There is ample support for this proposition, as counsel for Plaintiff argued to the Arbitration Panel, citing *Morgan Stanley DW, Inc. v. Frisby*, 163 F.Supp.2d 1371, 1379 (N.D.

Ga. 2001), in which the court noted the testimony of the President of Morgan Stanley's Consumer Markets Division that

> It is the normal practice in our industry. ... It is the way that business is done in our industry. Moreover, it flies in the face of the custom and practice of the brokerage industry to suggest that when an account executive moves from one brokerage firm to another he is not entitled to contact his former clients after he switches firms. ... [W]hen an account executive moves from one brokerage concern to another, he is entitled and expected to make use of the names of the customer that he served while employed by his prior brokerage firm.

Further, the *Frisby* court held that the broker-dealer was not entitled to use confidentiality agreements to restrict brokers from contacting their prior customers, citing *Dean Witter v Imperatore*, No. C-32-97E (Super. Ct. N.J. February 14, 1997), which refused to enforce the broker-dealer's restrictive covenant on the basis of equity and public interest. *Id.* at 1380, 1382. Plaintiff noted that Georgia law and North Carolina law are the same in that their "courts will not 'blue line' a covenant to save non-offending parts." *See Frisby*, at 1377-78. In short, Plaintiff cited sufficient legal authority for the Arbitration Panel to find the covenants of the Promissory Note unenforceable. In the absence of a reasoned opinion from the Arbitration Panel, neither the parties nor this Court can determine the specific factors on which the Arbitration Panel may have relied or its reasoning in rendering its Award.

## VIII.  THE COURT SHOULD REQUIRE UBS TO SHOW CAUSE WHY PLAINTIFF SHOULD NOT RECOVER HIS ATTORNEYS' FEES UNDER RULE 11.

Having reviewed the grounds alleged by UBS for vacatur of the arbitration award in this case, it is clear that UBS had no objectively reasonable belief that it could prevail in its efforts to convince the Court to set the Award aside.

The grounds advanced by UBS for vacating the arbitration award are nothing more than a replay of the very same legal arguments presented to the Arbitration Panel:

- That Mr. Van Pelt's defamation claim should be dismissed because the statement made by UBS in the Form U5 is true.

- That Mr. Van Pelt's defamation claim should be dismissed because statements made by a former employer in a Form U5 are subject to an absolute privilege.

- That Mr. Van Pelt's defamation claim should be dismissed because the "release" language contained in Mr. Van Pelt's Form U4 bars any such claim.

- That Mr. Van Pelt cannot maintain an action for wrongful discharge because he was an employee at will.

These same legal issues were the subject of *extensive* briefing and argument before the Panel, and UBS has provided absolutely nothing to suggest that the Panel strayed beyond the bounds of accepted legal analysis when it ruled in Mr. Van Pelt's favor. Under these circumstances, and with particular reference to the heavy burden placed upon any party seeking to overturn any arbitration award, it is unimaginable that UBS proceeded with the sincere belief that its Motion to Vacate was "warranted by existing law." *See Jamaica Commodity Trading Co. v. Connell Rice & Sugar Co.*, 1991 WL 123962 (S.D.N.Y. 1991) (awarding fees *sua sponte* where losing party sought "to avoid confirmation of the AAA panel's award based on the same arguments which the AAA panel explicitly rejected.").

Moreover, courts have become increasingly skeptical of attempts to vacate arbitration awards that are both perfunctory and patently futile. In a case decided earlier this year the Court of Appeals for the Eleventh Circuit took note of the increasing number of disappointed litigants who brought forward futile attempts to vacate arbitration awards for no other purpose than to put off the evil day when the losing party would be required to satisfy the award.

> In litigating this case without good basis through the district court and now through this Court, Harbert has deprived Hercules and the judicial system itself of the principal benefits of arbitration. Instead of costing less, the resolution of this dispute has cost more than it would have had there been no arbitration agreement. Instead of being decided sooner, it has taken longer than it would have to decide the matter without arbitration. Instead of being resolved outside the courts, this

dispute has required the time and effort of the district court and this Court. When a party who loses an arbitration award assumes a never-say-die attitude and drags the dispute through the court system without an objectively reasonable belief it will prevail, the promise of arbitration is broken. Arbitration's allure is dependent upon the arbitrator being the last decision maker in all but the most unusual cases. The more cases there are, like this one, in which the arbitrator is only the first stop along the way, the less arbitration there will be. If arbitration is to be a meaningful alternative to litigation, the parties must be able to trust that the arbitrator's decision will be honored sooner instead of later.

Courts cannot prevent parties from trying to convert arbitration losses into court victories, but it may be that we can and should insist that a party on the short end of an arbitration award attacks that award in court without any real legal basis for doing so, that party should pay sanctions.

*B.L. Harbert International, LLC v. Hercules Steel Co.*, 441 F.3d 905, 913 (11th Cir. 2006).

In the wake of the opinion in *Harbert*, a number of district courts have applied the admonition against pressing an objectively futile motion to vacate an arbitration award, wrestling with the appropriate standard, statute or rule that would serve as a proper basis for awarding sanctions. In *Reuter v. Merrill Lynch Pierce Fenner & Smith, Inc.*, 440 F.Supp.2d 1256 (N.D. Ala. 2006), for example, the district court found that an objectively futile motion to vacate constituted a violation of the pre-filing inquiry mandate of Rule 11. 440 F.Supp.2d at 1266. The court therefore *sua sponte* ordered the plaintiff to pay the attorneys' fees and costs incurred by the defendant in opposing the plaintiff's efforts to vacate the arbitration award.

Similarly, in *SII Investments, Inc. v. Jenks*, 2006 WL 2092639 (M.D. Fla. 2006), the district court sanctioned the plaintiff, who sought to set aside an abbreviated arbitration award made by an NASD panel – much like the award here under review. After disposing of the plaintiff's challenges as futile – "the facts of this case do not come within shouting distance of the manifest-disregard standard," *Id* at *3 – the court stated:

SII presents no evidence that Jenks's attorney urged the arbitrators to disregard the law. There is no evidence that the arbitrators decided the dispute on the basis of anything other than their best judgment-whether right or wrong-of how the law

36

applies to the facts of the case. The only manifest evidence in this case is SII's refusal to accept the law of the circuit which narrowly circumscribes judicial review of arbitration awards.

*SII Investments, Inc. v. Jenks*, 2006 WL 2092639 at *6.

As in *SII Investments*, UBS has offered only disagreement with the legal conclusions reached by the Arbitration Panel. UBS has pointed to no evidence that Plaintiff urged the Arbitration Panel to depart from controlling law or that the Panel did in fact depart from any clear controlling authority when rendering its decision. Meanwhile, Mr. Van Pelt has been deprived of the monetary benefits of the Award and the blemish on his Form U5 remains unchanged. Under these circumstances, the Court should sanction UBS for pursuing a course of action that is objectively futile – one that is based not on a objectively reasonable appraisal of existing law, but rather stems from a "never-say-die attitude" that will delay the resolution of this case by more than one year.

## CONCLUSION

For the reasons stated above, the Court should deny UBS's Motion to Vacate the Arbitration Award and confirm the arbitration award in full. Finally, the Court should order UBS to show cause why sanctions equal to plaintiff's costs and attorneys' fees should not be awarded.

Date: October 2, 2006

_andvcec_

Andrew O. Whiteman Bar Number: 9523
John R. Rittelmeyer Bar Number 17204
Hartzell & Whiteman, L.L.P.
Attorneys for Plaintiff
2626 Glenwood Avenue, Suite 500
Raleigh, North Carolina 27608
Telephone: (919) 571-8300
Fax: (919) 571-1004
E-mail: andywhiteman@hwlawyers.com

*Of Counsel:*

Sarah G. Anderson, Esq.
Sarah G. Anderson Esq. LLC
102 Wappoo Creek Dr., Suite 8
Charleston, SC 29412

Fred B. Monroe, Esq.
James, McElroy & Diehl, P.A.
600 South College Street, Ste. 3000
Charlotte, NC 28202

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a copy of the attached document or pleading was electronically filed with the United States District Court for the Western District of North Carolina with notice of case activity to be generated and sent electronically by the Clerk of the Court to the following parties registered to receive such service as follows:

> George C. Covington, Esq.
> William O. L. Hutchinson, Esq.
> Kennedy Covington Lobdell & Hickman, L.L.P.
> Hearst Tower, 47th Floor
> 214 North Tryon Street
> Charlotte, NC 28202

Date: October 2, 2006

Andrew O. Whiteman